**BASS RIVER ASSOCIATES t/a Bass River Yachting Center and Mariner Houseboats, Inc., Plaintiffs,**

v.

**The MAYOR, Township Commissioners, Planning Board OF BASS RIVER TOWNSHIP, and Bass River Township, Defendants.**

**Civ. A. No. 83–0743.**

United States District Court, D. New Jersey.

Sept. 16, 1983.

Edward V. Cattell, Jr., Stuart M. Goldstein, Cattell & Keating, Haddonfield, N.J., for plaintiffs.

Richard J. Shackleton, Frank A. Buczynski, Jr., Shackleton, Hazeltine & Dasti, Ship Bottom, N.J., for defendants.

## OPINION

BISSELL, District Judge.

*Introduction:*

The present action arises under the general federal question jurisdiction of this Court (28 U.S.C. § 1331) and the more particular provisions of 28 U.S.C. § 1343(3) and (4). The plaintiff Bass River Associates T/A Bass River Yachting Center (BRA) is a limited partnership organized under the laws of the State of New Jersey. BRA owns and operates the Bass River Yachting Center, a marina in Bass River Township, New Jersey. Plaintiff Mariner Houseboats, Inc. (Mariner) is a corporation organized under the laws of the State of New Jersey with its principal place of business in Egg Harbor Township, New Jersey.

Mariner manufactures floating homes which it seeks to sell and moor at Bass River Yachting Center. Defendants are the Mayor, Township Commissioners and Planning Board of Bass River Township, in their official capacity, and Bass River Township, a municipal corporation organized under the laws of the State of New Jersey.

Plaintiffs bring this action for injunctive, monetary and declaratory relief, attacking the validity of Bass River Township's Ordinance 83–1. A copy of that Ordinance is set forth in the Minutes of January 20, 1983, D–8 in evidence, annexed hereto as Appendix A. Plaintiffs attack both the underlying findings and the operative provisions of 83–1 because it excludes the use of floating homes and the operation of floating home marinas in Bass River Township.

Applications for preliminary injunctive relief and summary judgment were heard and considered by the Court in April, 1983. On April 28, 1983, this Court made several summary findings and conclusions regarding some of the issues in this matter. Those determinations were embodied in an Order of Partial Judgment entered May 18, 1983, as follows:

1. For purposes of determination of the Plaintiffs' arguments on preemption and burdens on interstate commerce, with the right reserved to the Defendants, however, to refute and rebut the Finding and Order hereby made, the Court Finds and Orders that the floating homes, subject matter of the litigation, are vessels for purposes of applying discussions of Admiralty Law and burdens on interstate commerce.

2. The Court further Finds and Orders that although the floating homes, subject matter of the litigation, are vessels, they are nonetheless designed primarily for homes for dockside use.

3. The Ordinance is clear on its face and precludes floating homes as defined therein, i.e., vessels, in fact, used, designed or occupied as permanent dwelling units, from being moored within the

confines of Bass River Township. The Ordinance does not operate to exclude vessels from free passage on the navigable waterways of Bass River Township.

4. The Court Finds and does hereby Order that Congress has not intended to preempt the regulation and control of 'gray water' discharge and does not bar nor prohibit either state or political subdivisions of states from enacting ordinances regulating and prohibiting 'gray water' discharge, provided such ordinances do not provide standards less stringent than those provided by Federal Law or regulation.

5. The Court Finds and does hereby Order that the impact of the ordinance on interstate commerce is incidental at best and not excessive when weighed and considered with local interests and local benefits and therefore it is Ordered that the ordinance does not impose an impermissible burden on interstate commerce.

6. The Court expressly reserves the following issues to be determined after a plenary trial, and the foregoing findings shall not limit the issues to be tried:

a. The issue of municipal estoppel as a result of the actions of members of the planning board or governing body and other municipal officials.

b. Whether the enactment of the questioned ordinance is a valid and proper exercise of the police powers, giving particular attention to the questions of whether the ordinance is void as being violative of due process or is void for being violative of the Equal Protection Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States; and further, whether the ordinance is a reasonable exercise of the police power.

7. The Court Finds and Orders that prohibition of the houseboats or floating homes in question does not make the ordinance in question invalid per se, but such issue shall be reserved to be ad-dressed by the Plaintiffs at the time of trial.

Trial upon the issues stated in paragraph 6 above was conducted before this Court on the dates of May 9–13, 17–19 and 23–26, 1983. Having received proposed findings of fact and conclusions of law (and replies thereto) from all parties, the Court submits this Opinion adjudicating those issues.[1]

## The Facts

A review of the description and use of plaintiffs' floating homes is in order. Copies of diagrams of these units (part of trial exhibit D–6) are annexed hereto as Appendix B. Plaintiffs' floating homes are documented as recreational vessels with the United States Coast Guard, in accordance with the Vessel Documentation Act of 1980, 46 U.S.C. § 65 et seq., and are subject to preferred ship mortgages filed with the U.S.C.G. at the ports of documentation. They are also registered as vessels with the State of New Jersey pursuant to N.J. S.A. 12:7–24.38. These vessels vary in length from thirty-two feet to forty-two feet and from twelve feet to fourteen feet in beam. Draft is less than one foot. Construction is of $3/4''$ marine plywood covered in fiberglass. The frames (ribs) are $2'' \times 10''$, with frame spacing of $16''$. The superstructure exterior is covered in $3/4''$ cedar siding, finished in one of a number of natural finishes, attractive in appearance. The vessels may be either towed from location to location or propelled by optional outboard engines. However, of the thirty-four floating homes built by Mariner through 1982, only three had tapered bows and none were ordered with an optional outboard. Each vessel is equipped with a U.S. C.G. approved Type III Marine Sanitary Device which complies with applicable U.S. C.G. and E.P.A. regulations. The retail price of these vessels ranges from approximately $50,000 to $70,000.

Plaintiffs' floating homes are designed to be moored to docks with conventional mooring lines which can be removed with-

---

**1.** The Court notes that the proofs submitted during the trial do not warrant alteration of any determination embodied in paragraphs 1 through 5 and 7 of the May 18, 1983 Order.

out any special procedures or tools. The parties have stipulated that a floating home is neither "out of navigation" nor "substantially a land structure" as those terms are used in United States Coast Guard regulations. No evidence developed at trial, however, dilutes this Court's pre-trial finding "that although the floating homes, subject matter of the litigation, are vessels, they are nonetheless designed primarily for homes for dockside use." May 18, 1983 Order, ¶ 2. Indeed, the floating homes contemplated for deployment at Bass River Yachting Center (approximately sixty-six in number) were to be used exclusively for on-site living, with no navigation contemplated after their arrival.

In early June 1982, Lawrence Alper, then the owner of Bass River Yachting Center, representing the plaintiffs, spoke by telephone to Mayor Floyd West of Bass River Township and described the plaintiffs' plan for the acquisition and development of that marina for the selling and mooring of plaintiffs' vessels. Mr. Alper invited Mayor West to Mariner's Cove Marina, in Egg Harbor Township, to examine models.

Within approximately ten days after that telephone conversation, John Best and Lawrence Alper met with Mayor West at Mariner's Cove Marina where several of the floating homes were located. At this meeting, which lasted approximately one and one-half hours, the plan for development of the marina in Bass River Township was described in depth to Mayor West, who was given an opportunity to visit and inspect models at Mariner's Cove. Included among the subjects discussed was litigation between Egg Harbor Township and Mariner's Cove Marina involving local opposition to the floating homes, and plaintiffs' desire to avoid a similar problem in Bass River Township. Also discussed was the issue of whether gray water discharged from the vessels presented an environmental problem. Plaintiffs informed the Mayor that, in their view, gray water was not an environmental problem and that the vessels did comply with all applicable U.S.C.G. and E.P.A. regulations. Plaintiffs then invited the Mayor, the Township Commissioners, the Township Engineer, and all members of the Township Planning Board to a meeting at which the plan for developing the marina would be presented, questions could be answered, and problems explored in hopes that the opposition encountered in Egg Harbor would not arise in Bass River Township.

In early July 1982, John Best and Larry Alper met with Mayor West, members of the Bass River Township Planning Board and others at Mariner's Cove Marina, in order to discuss the purchase and development of Bass River Yachting Center and other elements of the plan. At this meeting Messrs. Best and Alper made it clear that a substantial amount of money would be required for plaintiffs to acquire and develop the marina. It was also made clear that, if the plan were carried out, plaintiffs' floating homes would be sold and moored at the marina. The representatives of the Township toured the models of these boats. Questions asked by the Township officials were answered or discussed by plaintiffs' representatives. The Township officials expressed their interest in further exploring plaintiffs' plan, stating that they wished to see the marina in question successfully developed in some fashion. There were questions by several members regarding gray water discharge from the vessels, to which Messrs. Best and Alper responded. It was then agreed that an informal Planning Board meeting would be held, at which time an architect's rendering of the marina development would be presented, any additional questions asked and answered, and specifics of the development discussed further.

At this informal meeting of the Bass River Township Planning Board, held on July 22, 1982, Messrs. Martin Blatt, Larry Alper, John Best and plaintiffs' architect, Joel Bergman, met with members of the Planning Board and other residents of Bass River Township. It was the plaintiffs' stated intention, at the meeting, not only to answer any questions from the Planning Board but also to assure that the Board members were fully aware of the plans to

sell and moor floating homes at Bass River Yachting Center and to improve the marina. The Minutes of that meeting (P–1) accurately reflect the substance of the discussions concerning the marina and its contemplated floating homes:

Larry Alper, principal partner of Bass River Water Works; Marty Blatt, attorney; and Joel Bergman, architect approached the Board for an informal discussion regarding Bass River Marina's plans for (1) rearranging docking facilities for the inclusion of 66 houseboat slips; (2) new parking facilities; (3) refurbishing of the restaurant; (4) the addition of tennis courts; and (5) general cleaning up and refurbishing the marina. The discussion entailed details of the items listed above and two primary concerns of the Board: (1) the possible impact of the 66 houseboat units on the Bass River Elementary School and tax rate and (2) potential problems regarding the pollution of the Bass River with sewage and gray water. Mr. Woods and Mr. Seay stated that they hoped that the Board could work with the applicant to improve the marina while adequately addressing the problems of an influx of school age children and pollution of the Bass River.

Mr. Blatt stated that the sewage would be held aboard the houseboats in holding tanks and pumped out by a 'honey boat' using a vacuum system, that grey water flowing directly into the river posed no environmental problems, and that the marina would have houseboat owners sign a lease that prohibited children from living aboard except during the summer months.

Mr. Blatt, an attorney, advised that a substantial investment would be involved and that he and his partners wanted to know whether there would be opposition to the redevelopment of the marina including the presence of floating homes. Plaintiffs also expressed a desire to bring models to the marina to see if there were interested purchasers. It was in response to these initial comments, as well as the architectural presentation by Mr. Bergman, that questions ensued concerning children, local taxes and water discharge. Mr. Blatt's answers included comments that the floating homes were equipped with Coast Guard approved systems for gray water treatment and that plaintiffs could dock them at the marina free from local regulation.

The Planning Board did not express any open hostility to plaintiffs' plans. The comments of Messrs. Woods and Seay (*supra*) reflect the Board's general attitude. The Board and its members contemplated, however, that a formal presentation to the Board for site plan approval and a building permit would be forthcoming before the project would proceed. While site plan approval might not be necessary to permit the coming and going of different vessels at the marina, plaintiffs' presentation included plans for substantial alteration of docks, parking lots and the restaurant, as well as the addition of tennis courts. Furthermore, the presence of a residential community of over sixty housing units clearly constituted a significant change in the general use of the marina. Hence, it was reasonable for the Planning Board to assume, as the July 22 meeting drew to a close, that a formal application for site plan approval would be made. At no time did defendants represent to plaintiffs (either expressly or by implication) that they could proceed to develop their floating home community without site plan approval from the Planning Board.

Nor was there reason for that Board to assume that plaintiffs understood otherwise. Mr. Alper had made a prior formal application, approximately one and one-half years previously, regarding different plans for the marina. Mr. Blatt was an attorney, assumed to know the requirements of municipal law in this respect. Mr. Best had held several positions in the municipal government of Ventnor City, New Jersey over a fifteen-year period, including membership on or affiliation with its planning board for about ten years. This Court finds that these sophisticated, experienced developers were not misled to believe that they could proceed to market and install

floating homes at the marina without any other action by the municipality.

In August 1982, Peter Stemmer, Secretary/Clerk of the Planning Board, visited the marina and met briefly with Mr. Alper. Stemmer went aboard a model floating home with Alper, who also gave him a copy of an anticipated "lease" with occupants of these units that would prohibit children from living aboard during the school year. Neither Stemmer nor Alper mentioned any further interaction between the Planning Board and the plaintiff/developers. During this same time period, various investors, including Mr. Best, formed BRA, raised capital totalling approximately $250,-000 and then negotiated a financing package of approximately $750,000 with their bankers. On October 13, 1982, BRA purchased the Bass River Yachting Center for the sum of $655,000. Some floating homes had already been moved to the marina and capital improvements had commenced.

In September 1982, Ira Milovsky, Bass River Township Engineer, upon instructions from Mayor West and the Planning Board, who were concerned about the intrusion of plaintiffs' floating home community, began formulating and drafting Ordinance 83–1. Neither plaintiffs nor any of their representatives were informed about this development. The drafting of the ordinance continued through the fall of 1982. At the November 1982 Township Planning Board meeting the ordinance was discussed at great length. At the December 1982 meeting the ordinance was recommended, in its final form, by the Board.

Also in November, prior to the November Planning Board meeting, Ira Milovsky telephoned David Martin, a naval architect, to inquire about a "volume coefficient" [2] which would be applicable to the floating homes to be moored at plaintiffs' marina. Milovsky did not reach Martin and when advised that Martin had been retained by plaintiffs, Milovsky ceased his efforts to contact him. Following this call, Mr. Alper telephoned Floyd West inquiring as to why Mr. Milovsky had called, whether he, Alper,

could be of any assistance or answer any questions and, finally, if the matter was of concern to the marina or Mr. Alper personally. Mayor West stated that he did not know why Milovsky called Mr. Martin and did not advise Mr. Alper of the drafting of Ordinance 83–1. Instead, he gave Alper Milovsky's telephone number and advised him to call Milovsky. Mr. Alper called Milovsky, making the same inquiry of him and offering the same assistance. Mr. Milovsky, the individual chiefly responsible for the development and drafting of Ordinance 83–1, determined that his efforts should be confidential. Accordingly, he not only failed to tell Mr. Alper about the ordinance, he stated that his inquiry "did not concern" Mr. Alper.

Milovsky also telephoned several other persons, including Mr. William Healy, representing Viking Yachts, a local builder of pleasure craft. They discussed the "volume coefficient" and how it related to Viking boat hulls, ascertaining the Viking boat hulls fell below a specified "volume coefficient".

Milovsky formulated his "volume coefficient" and drafted Ordinance 83–1 specifically to exclude floating homes as they are defined in that ordinance. As of January 1983 only plaintiffs had expressed plans to establish a floating home marina in Bass River Township.

On January 7, 1983, plaintiffs learned from an article appearing in the *Atlantic City Press* that the Township was in the process of passing an ordinance which would ban the floating homes and thus thwart their planned development at the marina. This was the first notice plaintiffs had regarding Ordinance 83–1. The ordinance was scheduled for final passage on second reading on January 20, 1983.

After learning of the proposed ordinance, plaintiffs called the Township's environmental consultant, Mr. Pio Lombardo, to ask if he could develop an onboard gray water treatment system which would eliminate the objectionable elements of gray

**2.** *See* Ordinance 83–1 (Appendix A) for the definition of "volume coefficient".

water and be satisfactory to the defendants. Mr. Lombardo stated that he could develop such a system and that he would be willing to work with the plaintiffs on such a project. However, after consulting Mayor West and being advised that if he assisted the plaintiffs he would be jeopardizing his existing relationship as a consultant to the Township because of conflict of interest, Mr. Lombardo declined to assist plaintiffs.

On January 14, 1982 Mr. Blatt wrote to the Township Solicitor and requested that the final passage of the ordinance be stayed until plaintiffs could provide information which would obviate the need for a total prohibition of the floating homes. The Township refused this request.

The second reading of Ordinance No. 83–1 was held before the Board of Commissioners on January 20, 1983. Representatives of the plaintiffs appeared and argued against the premature passage of the ordinance. They stated that they had no intention of polluting the Bass River and that the floating homes would not detrimentally affect the environment. They again requested that the Board of Commissioners defer action on the ordinance to permit time to determine whether the Township's concerns could be met without the necessity of a complete ban of these vessels. The request was denied and the Township's Board of Commissioners proceeded to consider 83–1. As reflected in the Minutes of that meeting (Appendix A), thirteen written exhibits were received and considered (D–8a through D–8m), the last of which was the report of one Frank Sciremammano. Mr. Sciremammano had been retained by plaintiffs as a consultant regarding the impact of the floating home project upon the waters of the Bass River and vicinity. As summarized in the Minutes noted above, "He stated that the gray water from the proposed houseboats would not pollute the Bass River or harm the oyster beds" downstream. Appendix A/D–8 at p. 2184. When questioned at the meeting, however, Sciremammano acknowledged that he could not make a specific statement regarding the impact of such a gray water discharge on the oyster beds.

Rejecting plaintiffs' argument that there was neither a factual nor a legal basis for enactment of that ordinance, the Board of Commissioners, at the close of the meeting, passed Ordinance 83–1 in the form appearing in Appendix A.

### Municipal Estoppel

■ Plaintiffs contend that defendants encouraged the pursuit of plans to develop the floating home community at the marina while, at the same time, secretly drafting an ordinance to ban that project. Plaintiffs contend further that they reasonably believed that their plans were acceptable and, in reliance thereon, made substantial investments and financial commitments which are now thwarted by Ordinance 83–1. Accordingly, plaintiffs argue that defendants should be estopped from enforcing that ordinance or otherwise denying plaintiffs the right to sell and dock up to sixty-six floating homes at Bass River Yachting Center. Plaintiffs, however, have failed to establish this estoppel claim. Neither the supposed "encouragement" from the Planning Board and its members nor the equivocations of West and Milovsky to Alper (whether considered separately or together) raise an estoppel against the defendants from banning plaintiffs' floating homes.

The vast majority of reported decisions in New Jersey on the subject of municipal estoppel have evolved under circumstances where building permits have been issued and later revoked for various reasons. These cases themselves have gravitated into three general categories, described in *Trenkamp v. Township of Burlington,* 170 N.J.Super. 251, 271, 406 A.2d 218 (L.Div. 1979), as follows:

At the one extreme, a permit validly issued cannot be revoked after reliance, absent fraud. At the other extreme, a permit invalidly issued without any 'semblance of compliance with or authorization in the ordinance,' [cit. omit.] not only can be revoked after reliance, but also

collaterally attacked after the period for direct review has expired. The middle ground is occupied by those permits issued in good faith but based upon an erroneous, though arguably correct, interpretation of the zoning ordinance.

In the present case, no building permit was ever issued. Indeed, no formal application for site plan approval was filed. Plaintiffs sought only an informal meeting with the Planning Board in order to present their plans and determine whether clear opposition would be forthcoming. Meetings of this sort are expressly defined by New Jersey statute N.J.S.A. 40:55D-10.1, which provides as follows:

> At the request of the developer, the planning board shall grant an informal review of a concept plan for a development for which the developer intends to prepare and submit an application for development. The developer shall not be required to submit any fees for such an informal review. The developer shall not be bound by any concept plan for which review is requested, and the planning board shall not be bound by any such review.

Plaintiffs chose to terminate their submissions to the municipality with the conclusion of the informal Planning Board meeting based upon the firm belief, which they have continued to assert throughout this litigation (albeit erroneously), that their project to sell and moor floating homes was not subject to local regulation and, more particularly, did not require formal site plan approval and the issuance of a building permit.

Defendants argue that since no formal action of any sort was sought from the municipality, the body of decisional law which has arisen concerning municipal estoppel (including the few instances when it has been applied) is unavailable to plaintiffs; accordingly, the municipal estoppel claim is without legal basis and must therefore be dismissed. Though logically appealing, this argument is overly simplistic. The New Jersey decisions on the subject of municipal estoppel can provide some guidance in the present matter because of their treatment of the element of reasonable reliance by the developer. Indeed, the evaluation of the "middle ground" category of cases mentioned in *Trenkamp* centers upon the competing considerations of reasonable reliance on behalf of the developer and the public interest served by the challenged municipal action. Those considerations are as applicable in the present matter as they would be in a case where a building permit had been issued and subsequently revoked. *See: Howland v. Freehold,* 143 N.J.Super. 484, 488–90, 363 A.2d 913 (App.Div.1976). In the case at bar, in light of the limited, informal inquiries to municipal officials and the Planning Board, considering the express statutory provision that any review at such an informal meeting is not binding upon the Planning Board, considering further that the encouragement from municipal officials was general and cautious, without any specific endorsement of a floating home residential project, and considering also the plaintiffs' constant position that although they would seek to avoid controversy they nevertheless had the absolute right to proceed with the project free of local regulation, this Court finds and determines that the plaintiffs have failed to establish any reasonable reliance upon any action or inaction of the defendants which could form the basis for the imposition of municipal estoppel.

Nor do the evasive tactics of Mayor West and Mr. Milovsky in November 1982 resurrect any claim for municipal estoppel. The actions of these gentlemen took place after plaintiffs had fully committed their funds and their credit to the development of the marina. Furthermore, plaintiffs were given ample opportunity to attack Ordinance 83–1, in its final form, at second reading before the Township's Board of Commissioners. Accordingly, this Court determines that plaintiffs suffered no injury by not being advised of the potential enactment of such an ordinance during its formative stages.

### Due Process, Equal Protection and Exercise of the Police Power

Plaintiffs, in seeking to have Ordinance 83–1 stricken, argue that its enactment con-

stitutes an invalid, improper and unreasonable exercise of police power. Furthermore, they maintain that it violates both the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Defendants, to the contrary, assert that the ordinance represents a reasonable exercise of police power, rationally related to legitimate governmental purposes and goals, and in no way offends plaintiffs' rights to due process and equal protection.

■ At the outset, it is to be noted that a "zoning ordinance comes to the courts clothed with every presumption of validity." *City of Ann Arbor, Michigan v. Northwest Park Construction Corp.*, 280 F.2d 212, 223 (6th Cir.1960). *See also: Sternaman v. County of McHenry*, 454 F.Supp. 240, 242 (N.D.Ill.1978); *City of Highland Park v. Train*, 519 F.2d 681, 696 (7th Cir.1975); *Nasser v. City of Homewood*, 671 F.2d 432, 441 (11th Cir.1982). "Unless it is based upon a suspect classification or impinges on a fundamental right ... zoning legislation may be held unconstitutional only if it is shown to bear no possible relationship to the State's interest in securing the health, safety, morals or general welfare of the public and is, therefore, manifestly unreasonable and arbitrary." *City of Highland Park v. Train, supra*, at 696.

In assessing the validity of an enactment such as Ordinance 83–1, the test to be utilized is whether the ordinance is "reasonable". A leading decision so stating is *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). There, the appellant challenged a local ordinance on the ground that it deprived him of the beneficial use of his land without due process of law. The Court upheld the ordinance and in so doing refrained from enunciating any specific criteria by which to judge an ordinance. Instead, it preferred to utilize "the familiar standard of 'reason-

ableness'." *See: Goldblatt, supra*, at 594, 82 S.Ct. at 990. The Court, *quoting* from *Lawton v. Steele*, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894), phrased the standard of review as follows:

> to justify the State in ... interposing its authority in behalf of the public, it must appear, first, that the interests of the public ... require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals.

*Id.* 369 U.S. at 594–95, 82 S.Ct. at 990. The standard of "reasonableness" has been affirmed and utilized in numerous cases subsequent to *Goldblatt*,[3] and accordingly will be the criterion by which the present ordinance will be assessed.

■ Plaintiffs, in their Verified Complaint, insist that Ordinance 83–1 violates the Due Process and Equal Protection Clauses. They contend that the subject ordinance offends substantive due process in that it has no reasonable basis in a legitimate governmental purpose, is wholly arbitrary and capricious, and is nothing more than a facade behind which defendants mask their true purpose of depriving plaintiffs of their property without due process. Similarly, plaintiffs claim that defendants' differentiation between vessels based upon "volume coefficient" is an irrational distinction between similar vessels, contravening the Equal Protection Clause. Furthermore, plaintiffs contend that defendants use of an exclusionary rather than a regulatory ordinance violates both due process and equal protection. Defendants reply that Ordinance 83–1 represents a valid, proper exercise of the police power, reasonably based upon legitimate governmental interests, thus depriving plaintiffs of neither due process nor equal protection.

Plaintiffs' due process and equal protection arguments are not convincing. There

---

**3.** *See: e.g., Schad v. Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *American S & L Ass'n v. County of Marin*, 653 F.2d 364 (9th Cir.1981); *Nasser v. City of Homewood*, 671 F.2d 432 (11th Cir.1982); *City of Highland Park v. Train*, 519 F.2d 681 (7th Cir.1975).

is ample federal precedent supporting municipal action such as Ordinance 83-1.

Similar due process claims were asserted and rejected in the Third Circuit's decision in *Rogin v. Bensalem Township*, 616 F.2d 680 (3d Cir.1980). There, a real estate developer purchased land in Bensalem Township and received approval of Bensalem's Board of Supervisors to build a 557-unit condominium project. In reliance on this approval, the developer began construction and by early September 1976 had nearly completed 106 of the units. Later that month, the developer sought to obtain twelve additional building permits but, for the first time, his request was denied. The developer was informed that his plan no longer complied with Bensalem's zoning ordinance, which had been amended approximately one month after the approval of the original plan.[4] The developer appealed to the Zoning Hearing Board of Bensalem, and while this appeal was pending the ordinance was again amended, reducing the permissible density further still. After several unsuccessful administrative and state court proceedings, the developer brought an action in federal court seeking injunctive relief directing the Township to issue the remaining permits, and also requesting money damages. The District Court dismissed the claims and plaintiff appealed.

In addressing the developer's substantive due process claim, the Third Circuit noted that "the focus of due process analysis is not whether the Township has irrationally distinguished between similarly situated classes, but whether it was irrational for the Township to have passed the law at all ...." *Rogin, supra*, at 689. The Court went on to hold that the ordinance " 'need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought

that the particular legislative measure was a rational way to correct it.' " *Id.* at 689. (*Quoting Williamson v. Lee Optical Co.*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).) Having weighed the competing arguments, the Court dismissed the developer's substantive due process claim, ruling that "the Township has a legitimate interest in controlling population growth and density and the zoning amendments are a rational and reasonable means to accomplish that purpose. Therefore, the zoning amendments were not arbitrary or irrational....." *Id.* at 689.

In *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), the Village Council established a comprehensive zoning scheme regulating and restricting the location of industries, shops, apartment buildings, family housing and the height of buildings. A portion of Ambler's land lay within an area in which the zoning ordinance had completely prohibited industry. Ambler proceeded to attack the ordinance on due process grounds, claiming that it had held the land in question for a number of years with the purpose of selling and developing it for industrial purposes, and that the newly-enacted law prevented it from doing so. The Court spurned Ambler's arguments and upheld the validity of the ordinance, noting that the legislation represented a reasonable and valid exercise of the police power of the Village. Furthermore, it recognized the validity of an exclusionary ordinance barring the construction of industry, or certain types of housing, from particular areas, as long as that ordinance is rationally related to the legitimate interests of the enacting body.

In *Goldblatt v. Town of Hempstead, supra*, the appellant challenged a local ordinance that effectively prohibited the beneficial use to which he had put his land for some thirty-one years.[5] Appellant argued,

---

**4.** The stated purpose of the amendment to the ordinance was to reduce the allowable population density. *Rogin, supra*, at 683.

**5.** Appellant operated a mining business on a 38-acre tract and, during excavation, reached

the water table. Excavation continued until the pit became a 20-acre "lake" with an average depth of 25 feet. The Town sought to prevent further excavation that might damage the water table and act as an attractive danger to children.

as plaintiffs do presently, that Hempstead's ordinance was not regulatory but rather an unconstitutional preclusion of his mining business. The Court, discounting these contentions, upheld the ordinance despite the fact that it prohibited the present and presumably most beneficial use of the land.[6]

In a more recent decision, *Penn Central Transportation Co. v. New York City, supra,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, the Supreme Court was confronted with the "Landmark Preservation Law", an act designed to protect New York's historic sites. Pursuant to this act, the Grand Central Terminal, owned by appellants, was designated an historic site and earmarked for protection. Due to this designation, appellant was denied the opportunity to complete plans for the construction of a multi-story office building over the Terminal. Alleging violations of the Due Process Clauses of the Fifth and Fourteenth Amendments, the appellant brought suit claiming that the law was unreasonable and arbitrary. The Court denied appellant's challenge to the law, noting that the "restrictions imposed are substantially related to the promotion of the general welfare ...." *Id.* at 138, 98 S.Ct. at 2666.

Plaintiffs also contend that Ordinance 83–1 violates the Equal Protection Clause and reiterate their argument that their vessels are the targets of arbitrary discrimination. Unless it is based upon a suspect classification (which is not the case in the present dispute) the subject ordinance may be held violative of equal protection only if it bears no rational relationship to the legitimate interests of Bass River Township and is therefore arbitrary and unreasonable. *See: Ambler, supra,* 272 U.S. at 395, 47 S.Ct. at 121; *City of Highland Park v. Train, supra,* 519 F.2d at 696. "Inherent in all zoning legislation are statutory distinctions which give rise to claims of disparity of treatment." *Ibid.* However, such distinctions are not readily overturned merely because plaintiffs "have framed their grievance in the rhetoric of equal protection." *Ibid.* "The allegations in the [complaint suggest] no basis for applying any equal protection standard except the rational relationship test. In applying this test to legislation that affects business or other economic activity, the Supreme Court has accorded great deference to the legislative decision to establish the challenged classification." *Rogin, supra,* 616 F.2d at 687. One such case where this deference was accorded the legislative body is *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). There, the Court upheld a local ordinance defining the term "family" to *exclude,* not simply regulate, the plaintiffs—a group of six unrelated college students—from renting a house in the Village. The Court set forth the legitimate interests expressed by the Village, and then remarked that:

> A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one .... The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.

*Id.* at 9, 94 S.Ct. at 1541. *See also: Rogin, supra,* at 688.

In *Belle Terre,* the Court found no equal protection violation when the Township excluded the students, recognizing the legitimate interests of the Village. It determined that no suspect classification had been implicated, and held the exclusionary enactment rationally related to the asserted interests.

The law of New Jersey also supports defendants' right to exclude such housing projects as plaintiffs' floating home development. In support of the action taken

---

**6.** Although *Goldblatt* involved a "taking" claim asserted under the Due Process Clause of the Fifth Amendment, the analysis there is essentially identical to that of plaintiffs' substantive due process claim presented under the Fourteenth Amendment. Therefore, it follows that the dictates of *Goldblatt* are applicable to the instant case.

here, defendants cite *Vickers v. Twp. Committee of Gloucester Twp.*, 37 N.J. 232, 181 A.2d 129 (1962), which upheld ordinances barring trailer camps or parks from that township. In the words of that Court:

> Since trailer camps are not permitted in the other districts, the effect of the amended ordinance prohibiting them in the industrial district is to bar them from the entire municipality. There are no trailer camps in the township at present. Plaintiff contends that total prohibition is illegal. However, we have held that a municipality need not provide a place for every use. *Fanale v. Borough of Hasbrouck Heights* [26 N.J. 320, 139 A.2d 749 (1958)]. We do not think a municipality must open its borders to a use which it reasonably believes should be . excluded as repugnant to its planning scheme.

*Id.* at 248–49, 181 A.2d 129.

The Supreme Court of New Jersey's recent opinion in *So. Burlington Cty N.A. A.C.P. v. Mount Laurel Twp.*, 92 N.J. 158, 275–77, 456 A.2d 390 (1983) (*Mt. Laurel II*), declared *Vickers* "overruled", but not to the extent that any attempt to exclude a type of housing (even mobile homes) was invalid *per se*. The *Mt. Laurel* cases involved the obligation of a developing municipality to provide adequate low-income housing. *Ibid.*, and *see also So. Burlington Cty N.A.A.C.P. v. Twp. of Mt. Laurel*, 67 N.J. 151, 336 A.2d 713 (1975) (*Mt. Laurel I*). The Court in *Mt. Laurel II* held that a developing municipality may not automatically exclude mobile homes as a means to discharge that obligation in reliance upon the *Vickers* rationale that such exclusion could be based primarily upon considerations of aesthetics.[7] *Mt. Laurel II* itself acknowledges the right of exclusionary zoning under proper circumstances:

> Lest we be misunderstood, we do *not* hold that every municipality must allow the use of mobile homes as an affirmative device to meet its *Mount Laurel*

obligation, or that any ordinance that totally excludes mobile homes is *per se* invalid. * * *

> Insofar as the arbitrariness of a total exclusion is concerned, such conclusion will depend upon the facts and circumstances of each case, regardless of the *Mount Laurel* doctrine. While the question is not directly before us, there may be municipalities whose development is such that the otherwise inoffensive appearance of a mobile home park may be quite offensive. There may be municipalities whose only vacant land has been legitimately set aside for commercial, industrial or residential uses other than mobile homes, where such planning is quite legitimate. But just as *Vickers* is hereby overruled to the extent that it held that *any* developing municipality may totally exclude mobile homes, we hold, that such attempt at a total exclusion will have to be justified by the same doctrines that would justify a total exclusion of apartment houses, townhouses, or even single family residences. We recognize the propriety of aesthetic considerations in zoning, but the 'subjective sensibilities' of present residents are not a sufficient basis for the exclusion. *See Vickers*, 37 N.J. at 269 [181 A.2d 129] (Hall, J., dissenting).

*Id.* 92 N.J. at 276–77, 456 A.2d 390; emphasis by the Court.

It is also significant that *Mt. Laurel II* left undisturbed such decisions as *Pascack Ass'n Ltd. v. Mayor & Coun. Washington Twp.*, *supra*, (upholding that community's exclusion of multi-family housing); *Duffcon Concrete Products v. Borough of Cresskill*, 1 N.J. 509, 64 A.2d 347 (1949) (upholding zoning excluding heavy industry from a small residential community), and *Swiss Village Associates v. The Mun. Coun. Wayne Twp.*, 162 N.J.Super. 138, 392 A.2d 596 (App.Div.1978) (upholding ordinances barring high-rise apartments).

---

**7.** The parties in the present action have stipulated that *Mount Laurel II* has no direct application here because Bass River Township is not a developing municipality and plaintiffs' floating homes are not projected low-income housing. *See Pascack Ass'n Ltd. v. Mayor & Coun. Washington Twp.*, 74 N.J. 470, 480, 379 A.2d 6 (1977).

*See* references to these three decisions in *Mt. Laurel II* at 92 N.J. 207, 239 and 208, 456 A.2d 390, respectively.

Under New Jersey law, the validity of any attempt at exclusionary zoning (and the role of the courts in reviewing the same) is to be measured by standards elaborated in *Pascack, supra,* as follows: [8]

> [I]t would be a mistake to interpret *Mount Laurel* as a comprehensive displacement of sound and long established principles concerning judicial respect for local policy decisions in the zoning field. What we said recently in this regard in *Bow & Arrow Manor v. Town of West Orange,* 63 N.J. 335, 343 [307 A.2d 563] (1973), is worth repeating as continuing sound law:
>
> > 'It is fundamental that zoning is a municipal legislative function, beyond the purview of interference by the courts unless an ordinance is seen in whole or in application to any particular property to be clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the statute. N.J.S.A. 40:55–31, 32. It is commonplace in municipal planning and zoning that there is frequently, and certainly here, a variety of possible zoning plans, districts, boundaries, and use restriction classifications, any of which would represent a defensible exercise of the municipal legislative judgment. It is not the function of the court to rewrite or annul a particular zoning scheme duly adopted by a governing body merely because the court would have done it differently or because the preponderance of the weight of the expert testimony adduced at a trial is at variance with the local legislative judgment. If the latter is at least debatable it is to be sustained.'
>
> > \* \* \* \* \* \*
>
> ... It is obvious that among the 567 municipalities in the State there is an infinite variety of circumstances and conditions, including kinds and degrees of development of all sorts, germane to the advisability and suitability of any particular zoning scheme and plan in the general interest. There must necessarily be corresponding breadth in the legitimate range of discretionary decision by local legislative bodies as to regulation and restriction of uses by zoning.
>
> \* \* \* \* \* \*
>
> Beyond the judicial strictures against arbitrariness or patent unreasonableness, it is merely required that there be a substantial relation between the restraints put upon the use of the lands and the public health, safety, morals, or the general good and welfare in *one or more* of the particulars involved in the exercise of the use-zoning process specified in the statute.

*Id.* at 74 N.J. 481–83, 379 A.2d 6.

The current applicable New Jersey Statute is N.J.S.A. 40:55D–2, "not essentially dissimilar from" its predecessor. *Pascack, supra,* at 483 n. 2, 379 A.2d 6.

■ Accordingly, the power of a municipality to exclude, the standards which it must meet in doing so, and the court's scope of review of such municipal action are virtually identical under both the law of New Jersey, and federal law applying constitutional principles.

It is against the preceding principles of law that the Court must analyze the facts of this case to determine the validity of Ordinance 83–1.

Although the levels of gray water in the Bass River as it moves downstream from the marina will be reduced and dispersed substantially, legitimate concerns remain regarding the impact upon the downstream oyster seedbeds of even a slight change in the river's biological makeup. Furthermore, the impact of increased levels of gray water pollution in the marina basin itself, from more than sixty floating homes moored in close proximity, was not adequately minimized either in municipal proceedings or before this Court. The corre-

---

**8.** As noted above, *Pascack,* decided in 1977, succeeded *Mt. Laurel I* and survived *Mt. Laurel II.*

spondence received by the Board of Commissioners, expressly incorporated into the minutes of the January 20, 1983 meeting, presents authoritative evidence in support of excluding this large floating home community because of the potential impact of gray water discharge. (D–8B, C, D, E, F, H, J, L). Additionally, the decision to exclude the floating home community (and the enactment of Ordinance 83–1 to that end) are consistent with both the worthy environmental objectives and the express terms of the Bass River Township Master Plan (D–9).

Gray water was not the only concern explored by the Township and invoked in support of Ordinance 83–1. As stated in the express finding in 83–1's preamble:

WHEREAS, the change of the services provided in a marina to those services which are required for a houseboat or floating home marina as hereinafter defined in this Ordinance, will create, or likely create, problems including, but not limited to, trash storage and removal, fire protection, police protection, emergency power source requirements during electric power failures, solid freeze of water in mid-winter with resultant pier or bulkhead damages, as well as problems which may result during a hundred year flood condition, all of which must be considered by the Commissioners of Bass River . . .

(D–8; *see* Appendix A).

Several of these considerations, such as trash storage and removal, police protection (in a town without its own police force), and emergency power requirements are not unique to a floating home project. Problems with freezing water and flooding would be encountered with most large vessels, not only floating homes, although self-powered vessels designed for navigation can be more easily moved to avoid these problems. Accordingly, the considerations noted immediately above lend some but not overwhelming support to the exclusion of floating homes.

However, anticipated fire-fighting problems, unique to a floating home community, to be handled by a small, rural, volunteer fire company, were significant. In his letter to the Board of Commissioners (D–8G) Fire Chief Gene Zazinski noted that a burning floating home could not be approached from all sides, could easily spread fire to adjacent floating homes, and could endanger the lives of any firefighters aboard by sinking. K.W. Christensen, a licensed fire code inspector for Bass River Township and a member of its fire company since 1968, qualified as an expert in fire protection and supplied substantial additional evidence concerning potential fire problems in a floating home marina. Christensen's testimony established that plaintiffs had made no submissions to demonstrate that their homes complied with fire codes applicable to such structures clustered in close proximity. Floating homes on fire would not be stable enough to support ladders or allow men on the roof. The danger to a fireman falling into freezing water in full gear, including hip boots, is obvious. Limited access was also a difficulty. Cutting loose either a burning vessel or its neighbors might aid the fighting of a fire, but would generate other problems for these large, unpowered units. No concrete proposal for a fireboat and/or divers available at the marina was ever presented by plaintiffs. This evidence of anticipated fire problems at a floating home marina lends substantial support to Ordinance 83–1.

Additionally, the sixty-six floating homes, to be located on the thirty-two acres of Bass River Yachting Center, would, if considered as the housing development which it truly is, violate the Zoning Ordinance of Bass River Township, adopted May 20, 1982 (D–10). That ordinance provides for a minimum of 3.2 acres per residence. *Id.* at Article VII. Although there are non-conforming residential lots in Bass River Township that were developed before this 1982 ordinance, the Township must enforce that ordinance prospectively, at least to the extent of requiring formal applications to the Zoning Board of Adjustment for variances. *Id.* at Article XII.

**219**

Accordingly, the enactment of Ordinance 83–1 to address specifically the exclusion of floating homes and floating home marinas is entirely consistent with the 3.2-acre requirement of the underlying Township Zoning Ordinance.[9]

Plaintiffs submit that, whether considered individually or collectively, the concerns of the Township which motivated the exclusion of their project could have been addressed and minimized adequately by *regulation* of the floating homes and floating home marinas. Therefore, plaintiffs continue, enacting an ordinance of *exclusion* violated the standard of reasonableness against which this ordinance must be measured. This argument merits consideration, particularly since the floating homes are indeed documented vessels, the regulation of which has been addressed by the United States Supreme Court.

Plaintiffs argue that at most Bass River Township may apply "even handed local regulation" within the scope of *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960), but "may not exclude from its waters a ship operating under a federal license." *Id.* at 447, 80 S.Ct. at 818; *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1971); *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 6 L.Ed. 23 (1824). However, the significant federal interest in promoting the free passage of interstate and foreign shipping, directly relevant in *Huron Portland Cement* and *Ray*, is absent in the case at bar, particularly once plaintiffs' floating homes have been moored on sites at a marina. Accordingly, the admonition of such decisions against the exclusion of certain vessels from navigable waters is irrelevant to the facts of the case at bar, and thus does not

imperil an exclusionary ordinance such as 83–1.

Under this Court's limited scope of review of municipal legislative action, even if a regulatory pattern would have been effective, this Court may not merely substitute its judgment for the Township's decision to exclude plaintiffs' floating homes. In the words of the Third Circuit in *Rogin:*

> Implicit in this deference is the recognition that land-use regulation generally affects a broad spectrum of persons and social interests, and that local political bodies are better able than federal courts to assess the benefits and burdens of such legislation. Thus, absent defects in the process of enacting the legislation, or manifest irrationality in the results flowing from that process, courts will uphold state and local land use regulations against challenges based on federal constitutional grounds.

*Rogin v. Bensalem Township, supra,* 616 F.2d at 698.

The Township's choice to exclude rather than regulate floating homes was certainly not manifestly irrational. Planner and Township Engineer Ira Milovsky testified that the many problems which he foresaw resulting from plaintiffs' projected floating home development could not be resolved adequately by any action other than exclusion. Neither the record at trial nor the evidence presented to the Township Committee as of January 20, 1983 impeaches this opinion, which lends significant support to the reasonableness of the Township's decision to enact Ordinance 83–1. Furthermore, this ordinance has not condemned plaintiffs' property to idleness. Although they may not create a floating home community, plaintiffs may continue to operate their conventional marina at Bass River Yachting Center. Ordinance

---

**9.** It is undisputed that if plaintiffs had sought to market these same sixty-six living units as low-rise housing on the land portion of Bass River Yachting Center, they would have been subject to the requirements of Bass River Township's Master Plan, Subdivision and Site Plan Ordinance, and Zoning Ordinance. *See* D–9, D–10. Locating these units on floating barges moored to docks at the marina does not so alter the

nature of this project as to free it from this municipal legislation. Accordingly, even if Ordinance 83–1 had not been enacted, plaintiffs could not proceed with their floating home development without formal application to the Planning Board for site plan approval and/or to the Zoning Board of Adjustment for a variance. No such applications were made, either before or after the enactment of Ordinance 83–1.

83–1 will not be struck down on the grounds that other regulatory ordinances and procedures might have abated the problems anticipated from a floating home marina.

Plaintiffs also attack the terminology of Ordinance 83–1. They argue, in essence, that even if this Court determines that exclusion of their vessels is permissible, the terms of Ordinance 83–1 render it vulnerable to judicial review and thus unenforceable. Review of the ordinance indicates that only two of these criticisms require comment. Critical to the definition of "Floating Home" is the designation of such a vessel as one "whose volume coefficient is greater than 3,000 square feet." *See* Appendix A at 2187. "Volume coefficient is the ratio of habitable space of a vessel measured in cubic feet and the draft of a vessel measured in feet of depth." *Ibid.* Plaintiffs argue that the concept of "volume coefficient" is completely unknown and unprecedented, particularly in the classification of vessels. However, the mere fact that a concept has been newly developed for the purpose of characterizing and distinguishing certain structures, thereby producing a mathematical formula or coefficient which has not been employed previously, does not necessarily render that concept invalid. As noted previously, Ira Milovsky, the Municipal Engineer for the Township of Bass River, a man who also had planning experience and served as an advisor to the Township's Zoning Board of Adjustment and Planning Board, played a major role in the drafting of Ordinance 83–1. In particular, he developed the concept of volume coefficient after consultation with the United States Coast Guard, several boat builders, naval architects, and others. In Mr. Milovsky's words:

As a result of all my research noted above, I determined that houseboats, used primarily for recreational purposes, usually have a volume co-efficient of less than 3000 square feet, whereas floating homes, used primarily for year round

living, have a unique volume co-efficient well in excess of 3000 square feet. (P–20).

This testimony was confirmed by defendants' chart (D–16) disclosing the volume coefficients of several models of floating homes, houseboats and other large vessels. At trial, there was evidence that (depending upon the definition of the "draft" of these vessels) plaintiffs' smallest floating home might be calculated as having a volume coefficient of 2944 square feet. All volume coefficients for plaintiffs' floating homes shown on D–16, however, exceeded 6,000 square feet, a more realistic assessment of the actual nature and design of plaintiffs' floating homes. This Court determines that the volume coefficient formula and 3,000 square foot standard, employed in Ordinance 83–1 to distinguish plaintiffs' floating homes from other vessels, is a valid, reasonable basis for defining and excluding floating homes and floating home marinas.

During trial, the Court noted that the definition of the term "Houseboat" in Ordinance 83–1 would appear to encompass all pleasure vessels other than floating homes. *See* Appendix A at 2187. Since Section II(d) of that ordinance provides, "no marina shall use or permit to be used more than 5% of the total number of its approved boat slips or mooring sites for Houseboats," (*id.* at 2188) this portion of the ordinance would appear to prohibit the operation of a marina for pleasure vessels of any kind.[10] This obviously invalid definition and restriction against the mooring of vessels other than floating homes, however, can certainly be treated as "severable from the balance of the Ordinance and the remainder of the Ordinance shall remain in full force and effect." Ordinance 83–1, Section V, Appendix A at 2188. The severing of this provision would leave the definition and exclusion of floating homes and floating home marinas intact and effective. Furthermore, the entire gravamen of plaintiffs' claim is that they have been prohibited

---

**10.** After discussion of this point during trial, an amendment to this ordinance was introduced for first reading in Bass River Township. The Court has never been advised that this amendment was adopted. Moreover, none of the parties to this action has suggested that this Court should consider Ordinance 83–1 other than in the form enacted on January 20, 1983.

from developing a community of floating homes at their marina, not that other potential uses of that facility have been illegally excluded.

Accordingly, this Court determines that the terminology of Ordinance 83–1, as it defines and prohibits floating homes and floating home marinas within Bass River Township, is proper.

Pursuant to the foregoing analysis of applicable federal and New Jersey standards, the terms of Ordinance 83–1, the facts surrounding its enactment, and the attacks presented by plaintiffs, this Court determines that this ordinance is a valid exercise of the Township's police powers, vulnerable to neither due process nor equal protection claims in any respect.

One final point should be addressed briefly. Defendants submit that plaintiffs cannot maintain this action (or at least cannot establish any damages at the hands of the defendants) because plaintiffs have not even attempted to comply with the Coastal Area Facility Review Act (N.J.S.A. 13:19–1 et seq.), the New Jersey Wetlands Act (N.J.S.A. 13:9A–1 et seq.,) the New Jersey Pinelands Protection Act (N.J.S.A. 13:18A–1 et seq.) and the federal Rivers and Harbors Act (particularly 33 U.S.C. § 407). Plaintiffs argue with equal vigor that their floating home development is not subject to this legislation. Because the Court has determined that plaintiffs' project is subject to local regulation, even to the point of exclusion as provided in Ordinance 83–1, it is unnecessary to address the applicability of the state and federal legislation noted above.

For the reasons set forth above, judgment has today been entered in favor of all defendants, against all plaintiffs, dismissing the Verified Complaint in its entirety, with costs.

## APPENDIX A

Bass River Township

New Gretna, New Jersey

January 20, 1983

The January 20, 1983 meeting of the Bass River Township Board of Commissioners was called to order at 7:30 P.M. by Mayor West in the Township Municipal Building, North Maple Avenue, New Gretna, New Jersey. Members present were Mr. West, Mr. McGeoch, and Mr. Bethea.

Mayor West announced that the meeting was being held in accordance with The Open Public Meetings Act, notice being placed in *The Press* and *The Beacon*.

\* \* \*

Mayor West directed the Clerk to read Ordinance 83–1, first reading by title only approved at the January 6, 1983 meeting and published in the January 12, 1983 edition of *The Press*, AN ORDINANCE AMENDING AN ORDINANCE ENTITLED "AN ORDINANCE TO REGULATE AND RESTRICT THE LOCATION, HEIGHTS AND DENSITY OF BUILDINGS OR OTHER STRUCTURES; THEIR CONSTRUCTION AND USE; AND THE USE OF LAND IN THE TOWNSHIP OF BASS RIVER, IN THE COUNTY OF BURLINGTON; PROVIDING FOR THE ADMINISTRATION AND ENFORCEMENT OF THE PROVISIONS HEREIN CONTAINED; AND FIXING PENALTIES FOR ORDINANCE VIOLATION PURSUANT TO THE AUTHORITY OF R.S. 40:55D–1 et seq. AND TO ATTAIN COMPLIANCE WITH THE PINELANDS COMPREHENSIVE MANAGEMENT PLAN."

Mr. McGeoch stated that he would abstain from all discussion of and any action taken regarding Ordinance 83–1 due to ownership interests in a local marina.

Upon a motion made by Mr. Bethea and seconded by Mr. West, the second reading of Ordinance 83–1 was approved. Roll call vote with Mr. West and Mr. Bethea voting yes. Mr. McGeoch abstained.

Upon a motion made by Mr. Bethea and seconded by Mr. West, the public hearing on Ordinance 83–1 was opened at 7:38 P.M. Roll call vote with Mr. West and Mr. Bethea voting yes. Mr. McGeoch abstained.

Mayor West requested that the Clerk read for the record the following correspondence received pertaining to Ordinance 83–1. The Clerk was directed to place this correspondence in the Township files.

(1) The Bass River Township Planning Board's December 28, 1982 letter with accompanying Resolution recommending consideration and passage of draft Ordinance 83–1.

(2) Susan Hullings, Pinelands Commission staff member, November 23, 1982 letter regarding the potential negative impact of grey-water on the surface water quality.

(3) Dr. James Durand's, Director/Rutgers Marine Field Station, December 14, 1982 letter regarding the negative environmental impact on the water quality of the immediate and adjacent areas as a result of the placement of 60–100 cedar sided houseboats on the Bass River near Rt 9.

(4) Dr. James Durand's January 18, 1983 letter regarding grey water pollution problems posed by cedar sided houseboats on the Bass River. A copy of a December 27, 1982 letter from Donald Maxwell, oysterman, to Dr. Durand stating that the placement of houseboats in the Bass River Marina would be completely devastating to the shellfish industry in the Mullica River and Great Bay area was attached.

(5) Madelyn Muellar, Secretary, Atlantic Coast Shellfish Council, January 18, 1983 letter regarding the serious threat posed by the proposed house barges to the shellfish industry and supporting Ordinance 83–1.

(6) Donald T. Graham, Assistant Commissioner, New Jersey Department of Environmental Protection, January 12, 1983 letter sharing concern for the natural resources of the Great Bay Region and the potential threat to these resources from uncontrolled residential development both on-shore and off-shore. The DEP has taken the position that houseboats which contain no means of locomotion and/or are designed primarily as a residence are dwelling units for the purpose of CAFRA.

(7) Gene Zazinski, Chief/New Gretna Volunteer Fire Company, undated letter, received January 20, 1983, regarding fire safety related problems of homes located on the waters of the Bass River Marina.

West requested that anyone from the public who had a prepared statement regarding Ordinance 83–1 raise their hand to be recognized.

Dr. V. Eugene Vivian, Director of Research, Conservation and Environmental Studies Center, Inc., consultant to the Bass River Township Planning Board, submitted to the Clerk a copy of a January 4, 1983 letter to the Planning Board regarding the dangers of grey water pollution from floating house barges on the Bass River. The letter had been read at the January 6, 1983 Board of Commissioners meeting so was not read by Dr. Vivian.

Dr. V. Eugne Vivian read a prepared statement subscribing completely to Dr. James B. Durand's January 18, 1983 letter, reinterating his January 4, 1983 letter regarding gray water dangers posed by the floating home bardges, and listing other problems posed by floating home barges: (a) the disposal of solid wastes; (b) fire protection; (c) flood and ice storm damage; (d) traffic control and parking; and (e) police protection.

Paul C. Dritsas, representing the American Littoral Society, read a prepared statement in support of Ordinance 83–1 and urging its passage.

George Kurtz, Chairman of the Bass River Township Planning Board, read a January 20, 1983 letter reinterating the Planning Board's position that the introduction of floating homes would be detrimental to the Township's Master Plan and the health, safety, and welfare of township residents and urged the Commissioners to adopt Ordinance 83–1.

Richard Crema, Secretary, South Jersey Shellfisherman's Association, read a pre-

pared statement concerning the dangers posed to the shellfish industry by the proposed houseboats on the Bass River.

Donald Maxwell, oysterman, spoke in support of Ordinance 83–1 and its necessity in protecting the fragile oysterbeds in the Mullica River and Great Bay.

Norman Zlotnick, attorney representing Bass River Marina, stated that his clients object to the passage of Ordinance 83–1 and asked that it be tabled so that the problems could be further studied. He stated that his client had received Planning Board approval of the houseboats and proceeded with the project based on this approval. He concluded that the ordinance would be invalid because the Township does not have jurisdiction and stated that should the ordinance be adopted his client might sue the Township. Mr. Zlotnick objected to the complete banning of the houseboats stating that regulation would be the proper way to solve the pollution problems.

Frank Sciremammano, Jr., F–E–S Associates Marine and Environmental Consultants and consultant for Bass River Marina stated that he reviewed the November 23, 1982 letter from Susan Hullings, the December 14, 1982 letter from Dr. Durand, and the January 4, 1983 letter from Dr. Vivian and disagreed with their findings and conclusions. He stated that the grey water from the proposed houseboats would not pollute the Bass River or harm the oyster beds. He submitted a report to the Clerk that verified his conclusions.

John Best, houseboat builder, stated that he is concerned with pollution of the rivers and bay, and maintained that his houseboats would not pollute the Bass River and Great Bay. He objected to the passage of Ordinance 83–1.

Larry Alper, partner in Bass River Marina, stated that he had no intention of polluting the Bass River, rather, that he wished to clean up the marina. He objected to the passage of Ordinance 83–1.

Kirk Conover, Atlantic County Freeholder and oysterman, expressed support for Ordinance 83–1 stating that no one knows how much additional pollution would result in the destruction of the oyster industry and that it would be better to error on the side of caution than to allow additional pollution no matter how small.

There being no further statements or comments from the public, Mayor West directed the Clerk to place all written statements in the Township files.

Upon a motion made by Mr. Bethea and seconded by Mr. West, the public hearing on Ordinance 83–1 was closed at 9:00 P.M. Roll call vote with Mr. West and Mr. Bethea voting yes. Mr. McGeoch abstained.

Mr. West stated that he has studied the issues relating to Ordinance 83–1 over the past four months and believes that the passage of the ordinance is clearly in the best interests of the health, safety, and welfare of the residents of Bass River Township and necessary for the protection of the shellfish industry in the area.

Mr. Bethea stated that he has also studied the issues relating to Ordinance 83–1 over the past four months and agrees that passage is in the best interests of the health, safety, and welfare of Township residents and for the protection of the shellfish industry. He stated that he takes exception to Mr. Zlotnick's statement that the houseboats had received the approval of Township officials and stated that his stand on Ordinance 83–1 would be taken regarding the welfare of the Township and its residents and would not be influenced by threat of a law suit.

Upon a motion made by Mr. Bethea and seconded by Mr. West, Ordinance 83–1 was adopted. Roll call vote with Mr. West and Mr. Bethea voting yes. Mr. McGeoch abstained.

ORDINANCE NO. 83–1

AN ORDINANCE AMENDING AN ORDINANCE ENTITLED "AN ORDINANCE TO REGULATE AND RESTRICT THE LOCATION, HEIGHTS AND DENSITY OF BUILDINGS OR OTHER STRUCTURES; THEIR CON-

STRUCTION AND USE; AND THE USE OF LAND IN THE TOWNSHIP OF BASS RIVER, IN THE COUNTY OF BURLINGTON, PROVIDING FOR THE ADMINISTRATION AND ENFORCE-MENT OF THE PROVISIONS HEREIN CONTAINED; AND FIXING PENAL-TIES FOR ORDINANCE VIOLATION PURSUANT TO THE AUTHORITY OF R.S. 40:55D–1 et seq. AND TO ATTAIN COMPLIANCE WITH THE PINE-LANDS COMPREHENSIVE MANAGE-MENT PLAN.";

WHEREAS, the Board of Commissioners of the Township of Bass River, as municipal officials, acknowledge their duty to the residents and visitors to Bass River Township in protecting their health, safety and welfare; and

WHEREAS, as authorized by the Municipal Land Use Law, N.J.S.A. 40:55D–1 et seq. it is the responsibility of the municipal officials to pass upon Ordinances which regulate the orderly growth and development in Bass River Township in accordance with its Master Plan; and

WHEREAS, the use policy of the 1982 revision of the Bass River Township Master Plan states a commitment to maintaining a healthful and satisfying environmental quality; and

WHEREAS, the action of the Township Commissioners in modifying the Master Plan and Zoning Ordinance to conform with the Pinelands Comprehensive Management Plan is designed to guarantee continuing environmental quality of all environments within its territorial limits to include forests, rivers, wetlands and coastal waters; and

WHEREAS, the maintenance of high water quality of the Bass River, the Great Bay and all other waterways within the territorial limits of Bass River Township, is dependent upon the avoidance of all land use activities which could introduce pollutants into the soils, air or waters of the Township; and

WHEREAS, it has come to the attention of the Board of Commissioners, through the Planning Board of the Township of Bass River, that there is potentially a planned influx of houseboats and floating homes designed primarily for year round living which houseboats shall be located on or in the estuaries within the Township of Bass River; and

WHEREAS, the Board of Commissioners also are aware that the waterways and estuaries located within the Township of Bass River are, at the present time, in a pristine state and enjoyed by a multitude of residents and visitors to the area, primarily during the summer season for recreational purposes; and

WHEREAS, the oyster beds at the mouth of the Bass River are one of the last natural oyster beds on the eastern seaboard, a natural resource of which should be preserved and maintained; and

WHEREAS, the Bass River and Great Bay are dependent upon continuing high water quality to insure both commercial and recreational harvesting of shellfish and finfish population; and

WHEREAS, it is incumbent upon the governing body to protect said industry as well as protecting the established character and social and economic well being of the community; and

WHEREAS, it is also imperative that the Commissioners prevent the overcrowding of the use of said estuaries and to maintain them in the relatively non-polluted state as they currently exist; and

WHEREAS, in the opinion of the Planning Board of the Township of Bass River and their advisors, the major influx of houseboats designed primarily for year round living, are contrary to the protected and established character of Bass River Township and will detrimentally affect the use of the waterways within the Township of Bass River; and

WHEREAS, the Board of Commissioners of the Township of Bass River are cognizant of the dangers of the introduction of waste water or "grey water" of any kind into the pristine waters located within Bass River Township and the difficulty of cur-

tailing or preventing such introduction as a result of the intensification and influx of houseboats and floating homes; and

WHEREAS, the change of the services provided in a marina to those services which are required for a houseboat or floating home marina as hereinafter defined in this Ordinance, will create, or likely create, problems including, but not limited to, trash storage and removal, fire protection, police protection, emergency power source requirements during electric power failures, solid freeze of water in mid-winter with resultant pier or bulkhead damages, as well as problems which may result during a hundred year flood condition, all of which must be considered by the Commissioners of Bass River; and

WHEREAS, the Board of Commissioners of the Township of Bass River acknowledge receipt of a Resolution duly adopted by the Planning Board of the Township of Bass River recommending an Ordinance prohibiting the unbridled infusion of houseboats on the marinas and the waterways within the Township of Bass River; and

WHEREAS, it is the opinion of the Board of Commissioners of the Township of Bass River, after carefully considering the facts and information supplied to it that it would be in the best of interests of the residents of Bass River Township and for the municipality as a whole to restrict and prohibit their uncontrolled growth and burden on the waterways of the Township of Bass River.

The Board of Commissioners of the Township of Bass River do ordain:

## SECTION I

Article III entitled "Definitions" be and is hereby amended in subsection 3–2 by the addition of new definitions following subparagraph EB, to be known and designated as follows:

"FA–*Floating Home*–means any vessel in fact used, designed, or occupied as a permanent dwelling unit, business office, or source of any occupation, or for any private or social club of whatsoever nature, including, but not limited to, a structure constructed upon a barge primarily immobile and out of navigation or which functions substantially as a land structure while the same is moored or docked within the corporate limits of Bass River Township; whether such vessel is self-propelled or not and whose volume coefficient is greater than 3,000 square feet. Volume coefficient is the ratio of the habitable space of a vessel measured in cubic feet and the draft of a vessel measured in feet of depth.

FB–*Houseboat*–means those vessels not designed primarily for residential dwelling units, designed primarily for pleasure craft, recreation, and for independent navigation, whose volume coefficient is less than or equal to 3,000 square feet and not considered a Floating Home in accordance with the definition set forth in FA.

FC–*Floating Home Marina*–means that area within Bass River Township covered by any waterway within the Township where one or more sites or locations are rented or offered for rent, sold, or offered for sale for the location of Floating Homes.

FD–*Marina*–is defined as a dock or base and operated for profit or to which public patronage is invited providing moorings or marine services primarily for power yachts, launches or other water craft other than Floating Homes, and which is also capable of removing any and all crafts moored within the marina, out of the water for repair or as a result of emergent conditions.

## SECTION II

Article IX entitled "Special Standards and Requirements" be and the same is hereby amended by the addition of a new section, Section, 9–16 entitled *"Floating Homes or Floating Home Marinas"*.

(a) No Floating Home shall be occupied and no Floating Home Marina shall be permitted in any zone within the Township of Bass River.

(b) No marina shall permit the in water or out of water storage of any Floating Home.

(c) No person, firm or corporation shall operate or cause to be operated a Floating Home Marina or rent, hold out for rent or sell any site or space for the location of a Floating Home.

(d) No marina shall use or permit to be used more than 5% of the total number of its approved boat slips or moorage sites for Houseboats.

## SECTION III

The schedule of district regulations entitled "Schedule of District Regulations—Bass River Township" be and is hereby amended by the introduction of a new paragraph to the prohibited uses in all zones as follows:

"Floating Homes and/or Floating Home Marinas are prohibited in all zones within the Township of Bass River."

## SECTION IV

All Ordinances or parts of Ordinances inconsistent herewith are hereby repealed to the extent of such inconsistency.

## SECTION V

If any word, phrase, clause, section or provision of this Ordinance shall be found by any Court of competent jurisdiction, to be unenforceable, illegal or unconstitutional, such word, phrase, clause, section or provision shall be severable from the balance of the Ordinance and the remainder of the Ordinance shall remain in full force and effect.

## SECTION VI

This Ordinance shall take effect immediately upon its final passage and publication as provided by law.

Mayor West opened the meeting to the public at 9:06 P.M.

There being no comment from the public and no further business from the Board the meeting was duly adjourned at 9:06 P.M. upon a motion made by Mr. McGeoch and seconded by Mr. Bethea.

/S/   Peter H. Stemmer
Peter H. Stemmer
Township Clerk

_____

Floyd V. West

_____

T. Richard Bethea

_____

George McGeoch

APPENDIX B

Fishing out of your kitchen window? Yes! . . .
or any other window for that matter . . .
On your luxury Mariner Houseboat.

## MARINER HOUSEBOATS, INC. MODELS AND SPECIFICATIONS

### SUNDOWNER

Specifications:

| | |
|---|---|
| Length | 32' |
| Beam | 12' |
| Draft | 9" |
| Sun Deck | 18' x 12' |

### CALIFORNIAN - 38' & 42'

Specifications

| | | |
|---|---|---|
| Length | 38' | 42' |
| Beam | 12' | 14' |
| Draft | 8" | 10" |
| Sun Deck | 12' x 16' | 14' x 17' |

### 42' MARINER - II & III

| Specifications | II | III |
|---|---|---|
| Length | 42' | 42' |
| Beam | 14' | 14' |
| Draft | 11" | 11 |
| Floating Porch | 7' x 14' | 7' x 14 |

### Construction:

HULL - ¾" Marine plywood with fiberglass overlay. 2x10 ribs, on 16" centers in hull.

SUPERSTRUCTURE - Walls. 2x4; Siding, ¾" cedar; Sheath ½"; Sheetrock walls ½"; Moorewood stain exterior; Joist, 2x8 hemlock on hangers; Subfloor, ¾" tongue and groove; Ceiling joist, 2x8 hemlock; Rafters, 2x8; Roof shingles, Fiberglass 215#; Windows, insulated; Metal front door with window; Head with 55 gallon holding tank, 1 quart flush; Heat pump/air conditioner; Insulation, fiberglass, R17 in wall, R19 in ceiling; Styrofoam insulation under cedar in outside walls; Storage space; Wood plank ceiling, living area; Fully carpeted; Vinyl kitchen floor; Tile bath floor. Fiberglass tub; Wood cabinets in kitchen; Formica kitchen countertops.

### Standard Equipment:

Four burner G.E. range & oven • 15 Cu. Ft. G.E. Refrigerator • 24" G.E. dishwasher • 12,000 BTU G.E. air-conditioning/heating Zoneliner III units • 40 gal. hot water heater.

### Optional Equipment:

Single or twin outboard engines • Fireplace or airtight stove • Motorized skylight windows • Bilge pumps and alarm light • Custom stained glass windows • G.E. microwave oven • Built-in stereo system • Ceiling fan • G.E. Trash Master Compactor • Powder Room • Water storage tanks.

Manufacturer reserves the right to change specifications and/or component parts without notice or publication.

A unique new lifestyle has come to the East Coast. And with five models to choose from luxury can be yours: Cedar Siding • Skylights • Cedar Plank Ceiling • Custom Colors • Full Size Range, Refrigerator • Dishwasher • Heat Pump/Air Conditioner • Beams, 12' or 14' • Sundeck • Storage • Insulated for East Coast Winters • Head-Holding Tank System • Optional Choices.

## Mariner Houseboats, Inc.

Somers Point Road • Box 150 AA
Mays Landing, N. J. 08330
(609) 625-0885

# SUNDOWNER
### 12 x 32

D-6-A

Living Area

Up To Deck

Up

Sun Deck

## Mariner Houseboats, Inc.
Somers Point Road • Box 150 AA
Mays Landing, N. J. 08330
(609) 625-0885

Specifications:
  Length: 32'
  Beam: 12'
  Draft: 9"
  Sun Deck: 18' x 12'

Lower Stateroom

Down

Master Stateroom

Down

Head

Storage Closet

Down

Galley

# 42' MARINER III

D-6-E

### 14 x 42

Floating Porch

Living Area

Up

Galley

Closet

Head

Down

Up

Down

Second Stateroom

Dining Area or Third Stateroom

To Hull Storage

Closet

Optional ½ Bath

Down

**Mariner Houseboats, Inc.**
Somers Point Road • Box 150 AA
Mays Landing, N. J. 08330
(609) 625-0885

Specifications:
  Length: 42'
  Beam: 14'
  Draft: 11"
  Floating Porch 7' x 14'

Master Stateroom