743 F.2d 159
 1985 A.M.C. 1896
 BASS RIVER ASSOCIATES, t/a Bass River Yachting Center and
Mariner Houseboats, Inc., Appellants
v.
The MAYOR, TOWNSHIP COMMISSIONER, PLANNING BOARD OF BASS
RIVER TOWNSHIP and Bass River Township.
 No. 83-5727.
 United States Court of Appeals,
Third Circuit.
 Argued July 3, 1984.
Decided Aug. 31, 1984.
 
 Edward V. Cattell, Jr. (argued), Stuart M. Goldstein, Cattell & Keating, Haddonfield, N.J., for appellants.
 Richard J. Shackleton (argued), James E. Bishop, Frank A. Buczynski, Jr., Shackleton, Hazeltine & Dasti, Ship Bottom, N.J., for appellees.
 Before HIGGINBOTHAM, SLOVITER, Circuit Judges, and GREEN, District Judge*.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 At issue is the validity of an ordinance of Bass River Township, N.J., that bans "floating homes." The plaintiffs are the owner of a marina and a builder of houseboats, who together had planned to sell and moor boats. They were unable to do so because the township adopted the exclusionary ordinance as a response to the plaintiffs' proposal. Plaintiffs challenged the constitutionality of the measure in the United States District Court for the District of New Jersey. The district court rejected their challenge. We will affirm.
 
 I.
 FACTS
 
 2
 Bass River Township, in the pine barrens of New Jersey, is a sparsely populated, ecologically fragile area. Its waters are used by campers and boaters, and the estuarine areas contain oyster beds. The township does not have a police force or trash collection service, and it depends on volunteer firefighters. All real estate development is governed by the township's master plan, subdivision and site plan ordinance, and zoning ordinances, as well as the New Jersey Pinelands Protection Act, N.J.S.A. 13:18A-1 et seq. (1979 & Supp.1984), and Coastal Area Facility Review Act, N.J.S.A. 13:19-1 et seq. (1979). Under the master plan, minimum lot size for a dwelling is 3.2 acres.
 
 
 3
 Appellant Bass River Associates devised a plan to buy an existing 32-acre marina on the Bass River, to install amenities and, in a dealership agreement with appellant Mariner Houseboats, to sell and moor houseboats there. Sixty-six boats were to be moored in the eight-acre basin. The boats were designed for year-round living; they could either be towed from location to location or propelled by optional outboard engines but none of those built through 1982 were ordered with an optional outboard. App. at 80a. Sewage was to be removed by a vacuum pump system and discharged elsewhere, but the boats would discharge water from the bath, laundry and kitchen, termed "gray water".
 
 
 4
 The appellants and their architect presented the plan to township officials, who did not expressly oppose it. Appellants then purchased the marina. It is not clear what the parties' understanding was at this point. However, very soon thereafter, the township drafted the ordinance banning floating homes and the Board of Commissioners conducted a hearing. There, the marina project was opposed by state officials, shellfish industry representatives, and the chief of the local volunteer fire company, among others. The opposition was based primarily on ecological concerns but a consultant also anticipated problems involving trash disposal, flood and ice storm damage, traffic and parking, and police protection.
 
 
 5
 The Board then adopted the ordinance, which provides, in principal part:
 
 
 6
 (a) No Floating Home shall be occupied and no Floating Home Marina shall be permitted in any zone within the Township of Bass River.
 
 
 7
 (b) No marina shall permit in water or out of water storage of any Floating Home.
 
 
 8
 (c) No person, firm or corporation shall operate or cause to be operated a Floating Home Marina or rent, hold out for rent or sell any site or space for the location of a Floating Home.
 
 
 9
 Bass River Township, N.J., Ordinance 83-1, Section II (January 20, 1983).
 
 
 10
 The ordinance distinguishes between houseboats, which are defined in Section I as "those vessels not designed primarily for residential dwelling units," and "floating homes," defined as "any vessel in fact used, designed, or occupied as a permanent dwelling unit." The ban applies only to floating homes.[1] It is undisputed that the appellants were the only persons adversely affected by Ordinance 83-1 when it was enacted.
 
 
 11
 The appellants claimed in district court that the ordinance (1) was preempted by the federal licensing and water pollution statutes and (2) violated the appellants' due process and equal protection rights. The district court discussed and rejected the preemption argument in an unreported opinion. App. at 55a, and the case then proceeded to trial on the due process and equal protection issues. After trial the court dismissed the appellants' complaint. Bass River Associates v. Mayor of Bass River Township, 573 F.Supp. 205 (D.N.J.1983). The appellants appeal on both the preemption and Fourteenth Amendment issues.
 
 II.
 PREEMPTION
 A.
 Licensing of Vessels
 
 12
 The appellants contend that Ordinance 83-1 is preempted by the federal legislation providing for ship licenses.[2] They argue that because the boats used as floating homes would carry federal ship licenses the township may not exclude them from navigable waters. The district court rejected this argument on the ground that Congress intended the grant of licenses to protect the passage of vessels in interstate commerce and that that federal interest is not implicated in this case. We agree.
 
 
 13
 The appellants do not identify the specific statutory provision that they believe is preemptive. We proceed on the assumption that they refer to 46 U.S.C.A. Sec. 12109 (1983) (formerly 46 U.S.C. Sec. 65l ) and that the issuance of licenses to the floating homes comes within that section. It provides in its entirety:
 
 Sec. 12109. Pleasure vessel licenses
 
 14
 (a) A pleasure vessel license may be issued for a vessel that is--
 
 
 15
 (1) eligible for documentation;[3] and
 
 
 16
 (2) to be operated only for pleasure.
 
 
 17
 (b) A licensed pleasure vessel may proceed between a port of the United States and a port of a foreign country without entering or clearing with the Customs Service.
 
 
 18
 (c) The Secretary may prescribe by regulation reasonable fees for issuing, renewing, or replacing a pleasure vessel license, or for providing any other service related to a pleasure vessel license. The fees shall be based on the costs of the service provided.
 
 
 19
 Other statutory sections provide for licenses to be granted vessels engaged in the coastwise trade, 46 U.S.C.A. Sec. 12106 (formerly 46 U.S.C. Sec. 65i) and the fisheries, 46 U.S.C.A. Sec. 12108 (formerly 46 U.S.C. Sec. 65k). In addition to a license, vessels in the latter two categories must have a registry authorizing their use in the coastwise or fisheries trade. There is no registry for pleasure vessels.
 
 
 20
 The legal effect of a license (or documentation) alone is explained as follows:
 
 Sec. 12104. Effect of documentation
 
 21
 A certificate of documentation is--
 
 
 22
 (1) conclusive evidence of nationality for international purposes, but not in a proceeding conducted under the laws of the United States;
 
 
 23
 (2) except for a pleasure vessel license, conclusive evidence of qualification to be employed in a specified trade; and
 
 
 24
 (3) not conclusive evidence of ownership in a proceeding in which ownership is in issue.
 
 
 25
 46 U.S.C.A. Sec. 12104 (formerly 46 U.S.C. Sec. 65g) (emphasis added).
 
 
 26
 It is evident from examination of the various federal laws related to vessels and shipping, many of which were revised and consolidated in 1983 into new Title 46 of the United States Code, that no provision explicitly preempts state regulation or licensing of pleasure vessels. It is of some interest and no small significance that a provision in the same title does provide for federal preemption of state and local laws or regulations in the area of equipment performance and safety standards. 46 U.S.C.A. Sec. 4306 (formerly 46 U.S.C. Sec. 1459). While the absence of an explicit preemption provision as to pleasure vessel licenses is not conclusive, it is relevant that when Congress recently carefully reviewed the series of laws related to shipping, it chose not to include a provision expressing its intent to make federal licenses preemptive.
 
 
 27
 As the Supreme Court has observed recently, absent explicit preemptive language, state or municipal legislation can nonetheless be preempted where Congress has shown an intent to occupy the field, or, in the absence of such a showing of intent, where the two measures conflict. Silkwood v. Kerr-McGee Corp., --- U.S. ----, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983).
 
 
 28
 Turning then to the first inquiry as to Congressional intent, it is well established that "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). In determining whether Congress had the "clear and manifest purpose" of occupying the field of regulation, we first examine the statutory language.
 
 
 29
 Appellants concede that there is no federal compulsion to obtain a federal license for a pleasure vessel. At the owner's option, a boat may navigate with either a federal or state license. The reasons why pleasure vessels obtain federal licenses are unrelated to such lofty federal purposes as free passage along the navigable waters. They are, on the contrary, related to the financial transaction between the vessel's owner and mortgagee. Because a vessel must be federally licensed to be granted a preferred ship mortgage under the Ship Mortgage Act, 46 U.S.C. Secs. 911 et seq., owners ordinarily obtain federal licenses to satisfy mortgagees' requirements. See generally, G. Gilmore & C. Black, The Law of Admiralty, 695, 702-06 (2d. ed. 1975). Since appellants would have no preemption argument if the vessels had state licenses, which they are free to obtain, it is illogical to conclude that Congress intended to preempt local regulation merely by making a federal license available.
 
 
 30
 Furthermore, there is no legislative history of the licensing statutes to which appellants have referred us or which we have found containing any statement of an intent to supersede state regulation. In this respect, this case differs materially from Ray v. Atlantic Richfield Co., 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1972), where the Court held that the State of Washington's ban on large tankers in Puget Sound was preempted by federal legislation. In that case, the claim of preemption was supported by a statement in the legislative history of the preempting federal legislation, the Ports and Waterways Safety Act (PWSA), that state regulation of size and safety requirements for oil tankers "is not contemplated," see id. at 174, 98 S.Ct. at 1003. Furthermore, the Ray Court was concerned about maintaining uniform international standards and the need to accommodate foreign vessels, see id. at 167-68, 98 S.Ct. at 999, 1000, an issue conspicuously absent here. The PWSA patently does not preempt local regulation for environmental goals. See Chevron U.S.A. v. Hammond, 726 F.2d 483 (9th Cir.1984).
 
 
 31
 As authority for their preemption claim, the appellants rely primarily on cases involving commercial vessels. First among these is Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), holding that a state grant of a monopoly to a steamboat line was preempted by the federal Enrollment and Licensing Act. In Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), upon which the appellants also rely, the Court held that local air pollution regulations were not preempted by the federal licensing provisions but confirmed in dictum that "[a] state may not exclude from its waters a ship operating under a federal license." Id. at 447, 80 S.Ct. at 818. Finally, in Douglas v. Seacoast Products, Inc., 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977), the Court invalidated a Virginia statute barring foreign corporations from obtaining commercial fishing licenses in Virginia and barring nonresidents of Virginia from catching menhaden in the Virginia portion of the Chesapeake Bay. After an extensive discussion of Gibbons, the Douglas Court concluded that a license not only establishes the vessels' nationality but " 'implies, unequivocally, an authority to licensed vessels to carry on' the activity for which they are licensed." Id. at 280, 97 S.Ct. at 1749 (quoting Gibbons, 22 U.S. (9 Wheat.) at 212).
 
 
 32
 We find these cases inapposite, however, because they are based in the commerce power. As the Douglas Court explained, Gibbons' historic importance lies in its discussion of the commerce power, 431 U.S. at 275, 97 S.Ct. at 1746; the Gibbons Court concluded that "it seems very clear, that the whole act on the subject of the coasting trade, according to those principles which govern the construction of statutes, implies, unequivocally, an authority to licensed vessels to carry on the coasting trade." 22 U.S. (9 Wheat.) at 212 (emphasis added). The Douglas Court applied the same rationale to fishing licenses:
 
 
 33
 [T]here can be no question today that [power under the Commerce Clause] exists where there is some effect on interstate commerce. The movement of vessels from one State to another in search of fish, and back again to processing plants, is certainly activity which Congress could conclude affects interstate commerce. Accordingly, we hold that, at the least, when Congress re-enacted the license form in 1936, using language which, according to Gibbons, gave licensees "all the right which the grantor can transfer," it necessarily extended the license to cover the taking of fish in state waters, subject to valid state conservation regulations.
 
 
 34
 431 U.S. at 281-82, 97 S.Ct. at 1750 (footnotes and citations omitted).
 
 
 35
 In Gibbons and Douglas, then, the Court vindicated the federal interest facilitating interstate commerce. The same congressional purpose, even if it was not clear at the time of the Gibbons decision, has since been ratified by the re-enactment of substantially the same provisions of the licensing statute. See Douglas, 431 U.S. at 279, 97 S.Ct. at 1748. But as section 12104 makes clear, the policy has not been extended to pleasure vessels.
 
 
 36
 The statute clearly distinguishes between pleasure vessels and commercial vessels. For the latter it provides registry "authorizing the vessel to be employed in the coastwise trade, the Great Lakes trade, or the fisheries, as the case may be," 46 U.S.C.A. Sec. 12105; for the former there is no reference to any "authority". For pleasure vessels, as section 12104 makes explicit, Congress did not authorize any particular activity but simply provided a means of establishing the vessel's nationality.
 
 
 37
 Since pleasure vessels may carry state rather than federal licenses, it is apparent that the federal license is not required to authorize a pleasure vessel to sail on navigable waters in the United States. However, the absence of a federal license would not open the door to state power to proscribe such navigation, because it is well settled that even in the absence of a congressional exercise of power under the Commerce Clause, that clause "prevents the States from erecting barriers to the free flow of interstate commerce." Raymond Motors Transportation Inc. v. Rice, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978).[4] In any event, the Bass River Township ordinance is not interpreted by the township as prohibiting the passage of floating homes in township waters,[5] and that is not the use intended by appellants. We thus conclude that Gibbons and its progeny are inapposite and that Congress did not intend its licensing legislation to preempt local regulation of pleasure vessels, including prohibition of specified types of vessels,[6] in pursuit of legitimate local goals.
 
 
 38
 Since we find no manifest intent by Congress to displace local legislation, we must, under the two-tier preemption analysis of Silkwood v. Kerr-McGee, --- U.S. ----, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), look to see whether there is a conflict between the two measures in question. The local law will be invalidated if compliance with both is impossible or if the local legislation presents an obstacle to the accomplishment of the full purposes of the federal legislation. See also Chevron U.S.A. v. Hammond, 726 F.2d at 486.
 
 
 39
 Our inquiry will be brief, for we find no basis for claiming such conflict. First, compliance presents no problem because there is no requirement that an owner obtain a federal license. Second, as we stated above, the purpose of the licensing provision for pleasure boats is limited to identification of the vessel by nationality--a purpose in no way thwarted by Ordinance 83-1. We thus reject appellants' claim of preemption based on the federal shipping license statute.
 
 B.
 Federal Water Pollution Control Act
 
 40
 The appellants' claim that Ordinance 83-1 is preempted by regulation of vessel waste discharges in the Federal Water Pollution Control Act, 33 U.S.C. Sec. 1251 et seq. (1982) suffers in the first instance from the fact that the ordinance does not on its face purport to regulate or even prohibit discharge of gray water. Thus appellants' preemption claim as to water pollution must be based either on the fact that one of the purposes underlying the ordinance was concern about gray water discharge that would emanate from floating homes or on their argument that "the failure of the Congress or the [United States Coast Guard] to preclude gray water discharge in coastal waters from commercial or pleasure vessels can only be construed as an affirmative ruling that such discharge may continue." Appellants' Brief at 38. These claims are too far-fetched to merit serious consideration. It is untenable that Congress by imposing some pollution controls[7] intended to compel the states and local communities to permit the mooring of floating homes, even though there were other legitimate reasons unrelated to pollution for the local decision to exclude such homes. Surely the fact that Congress has authorized regulation of pollution from factories does not mean that it has so preempted the field that municipalities must henceforth permit factory construction in hitherto residential areas.
 
 
 41
 Even were the ordinance to be considered an antipollution regulation, appellants' preemption claim must fail. The district court found that the appellants' contention is answered by the federal statute itself. App. at 60a-63a. We agree. Section 1370 provides:
 
 
 42
 Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation ... which is less stringent than the effluent limitation ... under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.
 
 
 43
 33 U.S.C. Sec. 1370. This clearly shows Congress' intent not to preempt state antipollution efforts. While the FWPCA and its amending statutes were drawn as a strict and comprehensive scheme, see generally, Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), Congress was motivated primarily by the ineffectiveness of state controls. Congress nonetheless envisioned a joint federal-state effort. According to the statement of purpose in 33 U.S.C. Sec. 1251(b), "[i]t is the policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." See also Pacific Legal Foundation v. Costle, 586 F.2d 650, 657 (9th Cir.1978), rev'd on other grounds, 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980).
 
 
 44
 The courts have held, apparently without exception, that the Act does not preempt state remedies but vests the states with authority to impose controls more stringent than those required by the federal scheme. E.g., Chevron, U.S.A. v. Hammond, 726 F.2d 483 (9th Cir.1984) (state prohibition of discharge of oil-polluted ballast); Menzel v. County Utilities Corp., 712 F.2d 91, 93 n. 3 (4th Cir.1983) (sewage treatment regulations); Pennsylvania Coal Mining Association v. Watt, 562 F.Supp. 741, 746-47 (M.D.Pa.1983) (standards for surface mining effluents). Furthermore, the purposes of the federal Act and of Ordinance 83-1 are consistent. See Lake Carriers' Association v. Kelley, 527 F.Supp. 1114, 1122 (E.D.Mich.1981) (three-judge court), aff'd without opinion, 456 U.S. 985, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982). Thus we find little doubt about the policy evinced by section 1370, and no merit in the appellants' contention that "Congress has left no room for state supplementation." Brief of Appellants at 15.
 
 
 45
 Nor do we find any conflict in the operation of the two statutes. As with the licensing provisions, there is no difficulty in complying with both section 1322 and Ordinance 83-1. We also find no way, obviously, in which Ordinance 83-1 hinders attainment of the FWPCA's goals. The two measures do not regulate the same subject matter. Except for the fact that both seek to alleviate water pollution (and the Bass River ordinance has the additional purposes of preventing fire, traffic and public safety hazards), the statutes are not related. Thus we also reject appellants' preemption argument insofar as it relies on the Federal Water Pollution Control Act.
 
 III.
 DUE PROCESS AND EQUAL PROTECTION
 
 46
 Since Ordinance 83-1 is not preempted by federal legislation, it may be treated as zoning legislation and evaluated like any other exercise of the police power. The appellants have presented due process and equal protection challenges to the ordinance, but these were heard at trial and considered thoroughly by the district court. Judge Bissell found the ordinance to be a reasonable exercise of the police power, rationally related to the legitimate state goals of minimizing ecological damage and fire hazards. We adopt the reasoning in his published opinion, 573 F.Supp. 205, as the appellants have not presented any persuasive challenge to his conclusion that the ordinance had rational bases.
 
 IV.
 CONCLUSION
 
 47
 We conclude that the township's prohibition of floating homes is not preempted by the federal vessel licensing or water pollution statutes, and that it is a valid exercise of the police power. The judgment of the district court will be affirmed.
 
 
 
 *
 Hon. Clifford Scott Green, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The ordinance also provides that "[n]o marina shall use or permit to be used more than 5% of the total number of its approved boat slips or moorage sites for houseboats." Ordinance 83-1, Section II(d). That subsection has not been challenged in this litigation, however
 
 
 [2]
 The parties agree that appellants' boats are "vessels" for most purposes, as the district court acknowledged in its pretrial opinion. See App. at 56a. However, the boats' status as vessels is irrelevant except to establish the applicability of the licensing statutes
 
 
 [3]
 To be eligible for documentation, the vessel must be at least 5 net tons and owned by a United States citizen. 46 U.S.C.A. Sec. 12102 (1983) (formerly 46 U.S.C. Sec. 65b). The floating homes in question apparently would meet these criteria
 
 
 [4]
 We need not consider in this case the extent to which a local ordinance could constitutionally be applied to ships navigating in interstate waters within the state or local boundaries. Cf. American Trucking Associations, Inc. v. Larson, 683 F.2d 787 (3d Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982). In both Gibbons and Douglas, the Court stressed the discriminatory nature of the state statutes in favoring citizens over noncitizens. Unlike those statutes, Ordinance 83-1 is evenhanded and does not discriminate against foreign vessels
 
 
 [5]
 Read literally, the ordinance might be read as prohibiting even the temporary mooring of a floating home that is moving from one site to another. The township concedes that it may not prohibit such a temporary mooring, and argues that the ordinance, when read together with the definition of a floating home as a "permanent dwelling unit" and in its context as a zoning measure, should not be so read. Without ruling on this construction, we note the district court's finding that the floating homes that are the subject of this litigation are "designed primarily for homes for dockside use." 573 F.Supp. at 206. Our ruling is thus confined to the factual predicate before us
 
 
 [6]
 Appellants' contention that while the township could regulate their vessels in any reasonable manner it cannot exclude them entirely because the boats carry federal licenses and are subject to federal controls has been rejected by the Supreme Court. All zoning is by definition exclusionary. The Supreme Court established in Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), that a municipality may exclude certain types of structures altogether for traditional police power goals. It is not the stringency of the local restriction but the purpose of the federal legislation that is determinative. See Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). We recognize that under some circumstances the exclusion of ships or vessels would be so "clearly arbitrary and unreasonable" that it has no "substantial relation to the public health, safety, morals or general welfare." Euclid v. Ambler Realty Co., 272 U.S. at 395, 47 S.Ct. at 121. However, this record does not establish either the arbitrariness or unreasonableness that breaches the standard announced in Euclid. See Part III infra
 
 
 [7]
 Section 1322 of the Federal Water Pollution Control Act, governing marine sanitation devices, requires on-board treatment of sewage but not of gray water (except in the Great Lakes). 33 U.S.C. Sec. 1322. Section 1322(f)(1) explicitly preempts state legislation "with respect to the design, manufacture, or installation or use of any marine sanitation device," but the statute makes no reference to other kinds of pollution-control measures