Richard BEVERIDGE; Peter Murray; Gregory Davis; Peter Eastman, Plaintiffs–Appellants,

v.

Steven H. LEWIS; City of Santa Barbara, Defendants–Appellees.

No. 90–55642.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1991.

Decided July 29, 1991.

---

Peter F. Eastman, Santa Barbara, Cal., for plaintiffs-appellants.

Daniel J. Wallace, City Atty., and Stephen P. Wiley, Asst. City Atty., Santa Barbara, Cal., for defendants-appellees.

Before D.W. NELSON, O'SCANNLAIN and TROTT, Circuit Judges.

**D.W. NELSON, Circuit Judge:**

This case asks whether federal law regulating navigation, waterways, and harbors preempts and thus renders invalid a Santa Barbara city ordinance forbidding the anchoring or mooring of boats in a specified area during certain months of the year. The plaintiffs are owners of such boats and seek a judgment declaring the ordinance an invalid attempt by local government to regulate in an area preempted by the federal government. The district court found that the Ports and Waterways Safety Act of 1972 and related regulations did not preempt the ordinance. We affirm because federal regulations neither implicitly preempt nor actually conflict with the ordinance.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1984 the city of Santa Barbara enacted a municipal ordinance, Santa Barbara Municipal Code § 17.13.020, which states, in pertinent part:

> Prior to the mooring or anchoring of any vessel in the near vicinity and to the east of Stearns Wharf, permission for such mooring must be obtained in the manner required by Chapter 17.20 of this Code; provided that, in no event shall a vessel be moored or anchored within 300 feet of the easterly edge of Stearns Wharf or within one half mile of the easterly edge during the months of December through March.

The plaintiffs are owners of boats moored or anchored within that one-half mile of the easterly edge of Stearns Wharf and within the city limits. For many years vessels have moored or anchored east of the wharf, apparently without regulation by the city. The waters east of the wharf are entirely outside the harbor lines of the Santa Barbara harbor, which lies to the west of the wharf. The city acquired ownership of the wharf in 1983 and enacted the ordinance in 1984. The city has actively enforced the ordinance by issuing citations.

In 1989, plaintiffs, who objected to the prohibition on mooring or anchoring during the winter months, sued the city for injunctive relief. They argued that the federal government has exclusive jurisdiction over regulation of the coastal waters of the United States, specifically the waters east of Stearns Wharf in Santa Barbara. The city ordinance, they argued, is therefore an invalid attempt by local government to regulate in an area preempted by the federal government. The district court dismissed the action, holding in a well-articulated opinion that Santa Barbara could regulate where its ordinances were neither implicitly preempted by, nor in actual conflict with, applicable federal regulations. Plaintiffs appealed.

## II. STANDARD OF REVIEW

■ We review this legal question of statutory interpretation de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## III. DISCUSSION

### A. Framework For PWSA Preemption

In 1972 Congress passed the Ports and Waterways Safety Act ("PWSA"), codified at 33 U.S.C. § 1221 et seq., the main purposes of which included reducing the possibility of vessel or cargo loss, protecting the marine environment, preventing damage to structures on or adjacent to navigable waters, and ensuring that vessels complied with applicable standards for safety and operation. 33 U.S.C. § 1221(c). Federal law, therefore, now regulates much of the activity on or near navigable waterways. At the same time, states and local governments were not entirely excluded from supplementing federal regulations with their own ordinances.

The Supreme Court's lone foray into the PWSA's preemptive effect on state law is *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), in which Atlantic Richfield challenged the state of Washington's Tanker Law on the grounds that such regulation was preempted by federal law. The Court found that most of Washington's regulations were in actual conflict with the PWSA and thus

invalid; it did, however, uphold the state's tug-escort requirement. *Ray* is initially important because it sets out the preemption framework we follow.

The Court began its analysis with the reminder that

> prior cases indicate that when a State's exercise of its police power is challenged under the Supremacy Clause, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

*Id.* at 157, 98 S.Ct. at 994 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). It then explained that Congressional purpose

> "may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose."

*Id.* (quoting *Rice* at 230, 67 S.Ct. at 1152) (internal citations omitted). Finally,

> [e]ven if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute. A conflict will be found where compliance with both federal and state regulations is a physical impossibility ..., or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Id.* at 158, 98 S.Ct. at 994 (internal quotations and citations omitted).

■ This extensive quoting demonstrates that there are two ways in which preemption can occur absent express preemption language. First, Congress may *implicitly* occupy a field through pervasive regulations that leave no room for states to supplement or through the federally sensitive nature of the particular subject area (e.g., foreign affairs). Second, even if it does not implicitly occupy the field, federal law preempts local regulation where there is an *actual conflict*.[1] Our analysis, therefore, must first determine whether Congress has implicitly occupied the field of anchorage and mooring close to shore. If not, we next assess whether Santa Barbara's ordinance runs directly afoul of a specific federal regulation.

In *Ray*, once it had set out this entire framework, the Court moved on to its specific analysis. It held that Congress did not so occupy the field of waterways and harbors that the state of Washington could not regulate. It nevertheless found that the Washington law was in direct conflict with federal regulations on a number of points. As to the tug-escort requirement, though, the Court held that Title I of the PWSA "merely *authorizes and does not require* the Secretary to issue regulations...." *Id.* at 171, 98 S.Ct. at 1001 (emphasis added). The Court found that "[t]he relevant inquiry under Title I with respect to the State's power to impose a tug-escort rule is thus whether the Secretary has either promulgated his own tug requirement ... or has decided that no such requirement should be imposed at all." *Id.* at 171–72, 98 S.Ct. at 1001. While rules might be forthcoming that would preempt the state's present rule, "until

---

1. Other courts have phrased this test as a tripartite one, assessing as a separate issue whether Congress has expressly stated that federal law preempts state or local law on a particular topic. *See, e.g., Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1415 (9th Cir.1990) ("Federal law preempts state law if (1) Congress expressly so states, (2) Congress enacts comprehensive laws that leave no room for additional state regulation, or (3) state law actually conflicts with federal law." (citations omitted)). Since challenges are rare when express preemption is manifest, the two litigated issues will almost always be implicit preemption and actual conflict. We perfunctorily note that Congress has not expressly stated that federal law preempts Santa Barbara's mooring ordinance.

that occurs, the State's requirement need not give way under the Supremacy Clause." *Id.* at 172, 98 S.Ct. at 1002.

The second critical case that informs our analysis is this circuit's decision in *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483 (9th Cir.), *cert. denied sub nom., Chevron U.S.A., Inc. v. Sheffield,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985). In *Chevron* we held that an Alaska statute prohibiting oil tankers from discharging ballast into territorial waters of Alaska was not void on the ground that it conflicted with Coast Guard regulations. Relying heavily on *Ray,* we held that the PWSA and the Port and Tanker Safety Act of 1978 ("PTSA") did not preempt Alaska's statute.

In *Chevron,* after noting the absence of express preemption language, we followed the same dual analysis articulated in *Ray.* We looked to see whether Congress *implicitly* intended to occupy the field of regulating pollution from oil tankers within a state's territorial waters and also whether the Alaska statute *actually conflicted* with Coast Guard regulations. *Id.* at 486. We also noted that "if we are left with a doubt as to congressional purpose, we should be slow to find preemption, '[f]or the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden.'" *Id.* at 488 (quoting *Penn Dairies v. Milk Control Comm'n,* 318 U.S. 261, 275, 63 S.Ct. 617, 623, 87 L.Ed. 748 (1943)). Further, "Congress certainly has the power to 'act so unequivocally as to make it clear that it intends no regulation but its own.'" *Id.* (quoting *Rice,* 331 U.S. at 236, 67 S.Ct. at 1155). We found that "the local community is more likely competent than the federal government to tailor environmental regulation to the ecological sensitivities of a particular area." *Id.* at 493. In sum, we found no implicit intent to occupy the field.

In addition, we found no actual conflict. We warned:

> [W]e must be guided by the Court's reluctance to entertain hypothetical conflicts because "[i]n this as in other areas of coincident federal and state regula-

tion, the teaching of this Court's decisions ... enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists."

*Id.* at 499 (quoting *Seagram & Sons v. Hostetter,* 384 U.S. 35, 45, 86 S.Ct. 1254, 1261, 16 L.Ed.2d 336 (1966)) (internal quotation and citations omitted). Finally, we noted the importance of recognizing the difference between necessary and possible conflicts, as there would be time to consider future conflicts should they arise. *See id.* at 501. Bearing *Ray* and *Chevron* in mind, we proceed to an examination of the present facts.

### B. Implicit Preemption

Appellants argue that the federal scheme of regulation of harbors and navigations, as embodied in the PWSA, is so vast that it should implicitly preempt local ordinances on this subject. They point to the statement of policy and general purposes behind the PWSA, codified at 33 U.S.C. § 1221. However, just because Congress has intended to reduce the possibility of cargo and vessel loss, prevent damage to structures on or near navigable waters, ensure that vessels comply with certain standards, and just because it believes that "navigation and vessel safety and protection of the marine environment are matters of major national importance," *id.,* does not necessarily mean that the city of Santa Barbara is completely trammeled in all regulatory efforts.

■ Just as *Ray* refused to find implicit preemption and proceeded to discuss the *actual* conflicts between Washington's Tanker Law and federal regulations, we cannot hold that the PWSA occupies the entire field of regulation of anchorage and mooring. We cannot distinguish tanker (*Ray*) and pollution (*Chevron*) regulations from mooring restrictions. If both the Supreme Court and this circuit did not find Congress to have intended to preempt all local regulation by the PWSA in those areas, it is difficult to conceive how it could be found here. In fact, tanker and pollution concerns are far less embedded in local tradition and history than are navigation

and anchorage issues. The Supreme Court recognized this in *The James Gray v. The John Fraser*, 62 U.S. 184, 187, 16 L.Ed. 106 (1858):

> And the local authorities have a right to prescribe at what wharf a vessel may lie, and how long she may remain there ..., where she may anchor in the harbor, and for what time; ... And there is nothing in the regulations referred to in the port of Charleston which is in conflict with any law of Congress ...

While federal regulation over the past century has greatly qualified this sweeping statement, there is no reason to believe that Congress intended to occupy the field in the area of mooring any more than in tankers or marine pollution. It might even be said that localities retain greater autonomy in this area. *Cf. Bass River Associates v. Mayor of Bass River Township*, 743 F.2d 159 (3rd Cir.1984) (township's prohibition of "floating homes" not preempted by federal vessel licensing regulations).

■ It is undisputed that the Secretary of Transportation has extensive authority to regulate the anchoring, mooring, and movement of vessels, but this power is discretionary. *See* 33 U.S.C. § 1223. The Secretary *may* act to affect all of these navigational issues, but he need not. As *Ray* noted, "Title I, however, merely authorizes and does not require the Secretary to issue regulations." *Id.* at 171, 98 S.Ct. at 1001. Where he has not acted, no preemption has taken place. We have stated that there is congressional intent that "there be joint federal/state regulation of ocean waters within three miles of shore." *Chevron*, 726 F.2d at 489. The activity here certainly occurs within that geographical zone. It should be remembered that "comprehensiveness alone is not enough to demonstrate a federal intent to occupy the entire field." *Id.* at 491. We hold that the federal regulations, though comprehensive, do not in this instance implicitly preempt Santa Barbara's ordinance.

### C. Actual Conflict

Since we agree with the district court that there is no implicit preemption,

§ 17.13.020 must actually conflict with federal regulation for appellants to prevail.

#### 1. 33 U.S.C. § 1225(b)

■ Appellants ask this court first to look at 33 U.S.C. § 1225(b), which states: "Nothing contained in this section, with respect to structures, prohibits a State or political subdivision thereof from prescribing higher safety equipment requirements or safety standards from those which may be prescribed by regulations hereunder." Appellants argue that by permitting states to regulate "with respect to structures," the statute impliedly forbids localities to regulate *with regard to vessels*. This interpretation is supported by language from *Ray*, which held that "§ 1222(b) [the forerunner of § 1225(b)], by permitting the State to impose higher equipment or safety standards 'for structures only,' impliedly forbids higher state standards for vessels." *Id.* at 174, 98 S.Ct. at 1002. The question then turns on whether the mooring regulations are safety standards for vessels.

The district court held that "[t]he Santa Barbara ordinance clearly has nothing whatsoever to do with safety equipment on vessels[,] and it is doubtful whether prohibiting mooring in a designated area can properly be characterized as a safety standard of a vessel." We agree. *Ray* discussed safety standards in the context of vessel size. Both vessel characteristics and safety equipment are distinguishable from anchorage prohibitions.

■ Appellants also argue that "safety standards" is a reference not limited to vessels and that decisions on mooring areas implicate safety standards for the harbor. They cite a declaration in the record showing that a large reason for the mooring restrictions was to protect Stearns Wharf from possible damage. Appellants liken this restriction to the description of "security zones" in 33 C.F.R. § 165: "A security zone is an area of land, water or land and water which is so designated ... for such time as is necessary to prevent damage or injury to any vessel or waterfront facility." 33 C.F.R. § 165.30(a). The difficulty with such a comparison is that safety or security

zones are officially established by the Coast Guard, 33 C.F.R. § 165.5(a), which obviously has not been done. Furthermore, such security zones provide that "[n]o person or vessel may enter or remain in a security zone without the permission of the Captain of the Port," 33 C.F.R. § 165.33(a), who "may take possession and control of any vessel in the security zone ... [or] remove any person, vessel, article, or thing from a security zone." 33 C.F.R. § 165.33(c),(d). It is apparent, therefore, that security zones are vastly dissimilar from simple mooring regulations. Appellants' comparison is thus inapposite. We find that 33 U.S.C. § 1225(b) is not in conflict with Santa Barbara's ordinance.

### 2. 33 C.F.R. § 110.115

Appellants next argue that because the Code of Federal Regulations sets out a specific bounded area of Santa Barbara's waters in which local rules are to apply, only federal regulation can apply outside that area. 33 C.F.R. § 110.115 sets out the specific area:

North of the Santa Barbara breakwater; seaward of the line of mean high water; and southwest of a line bearing 46 degrees 30 minutes from the north corner of Bath Street and Cabrillo Boulevard to the end of the Santa Barbara breakwater; excluding a fairway 225 feet wide, 100 feet from each side of and parallel to the Navy pier.

Note: Fore and aft moorings will be allowed in this area conforming to the City of Santa Barbara Harbor Ordinance No. 2106 for yachts and small craft of such size and alignment as permitted by the harbor master.

There is no doubt that appellants wish to anchor outside the described area.

The problem for appellants is that § 110.115 is included in Subpart A of "Anchorage Regulations." 33 C.F.R. § 110. 33 C.F.R. § 110.1(a) regulates all of Subpart A and states:

The areas described in Subpart A of this part are designated as special anchorage areas pursuant to the authority contained in an act amending laws for pre-

venting collisions of vessels.... Vessels not more than 65 feet in length, when at anchor in any special anchorage shall not be required to carry or exhibit the white anchor lights required by the Navigation Rules.

Subpart A, then, notes areas in which *navigation lights* are not required. It does not refer to anchoring or mooring in general. Subpart B is concerned with that issue: "The anchorage grounds for vessels described in Subpart B of this part are established...." 33 C.F.R. § 110.1(b). Waters within the city limits of Santa Barbara are not mentioned in Subpart B, and thus appellants cannot point to a specified anchorage area outside of which federal regulations apply.

The district court's proper understanding that Subpart A refers to required lighting and Subpart B to anchoring is buttressed by two other considerations. First, 33 C.F.R. § 109.10 states that an act of Congress "provides for the designation of special anchorage areas wherein vessels not more than sixty-five feet in length, when at anchor, will not be required to carry or exhibit anchorage lights." Section 110 then proceeds to list such areas. Second, appellants argue that it is a far too narrow interpretation to conclude that the areas listed in Subpart A refer only to illumination. They argue that those areas must refer to anchoring and mooring as well. This is refuted by the fact that Subpart B contains a number of the same harbors as Subpart A. If A were meant to refer to anchoring as well as lighting, surely it would be redundant to describe different anchoring areas in the same harbors in B. We agree with the district court that the Santa Barbara ordinance is not in conflict with 33 C.F.R. § 110.115.

### D. Attorney Fees

Unsurprisingly, appellants make no arguments as to why they are entitled to attorney fees. Perhaps they omit a section on this topic because they are unable to ascertain how a party obliged to defend a *favorable* lower court holding could possibly be held liable for attorney fees on appeal. We deny the request.

## IV. CONCLUSION

We affirm the district court's holding that Santa Barbara's ordinance is neither implicitly preempted by comprehensive federal regulation of navigation and harbors nor in actual conflict with any specific federal regulation.

AFFIRMED.