**George MURPHY, an individual, and Carrib Isle Association, Inc., a Florida corporation, Plaintiffs,**

v.

**DEPARTMENT OF NATURAL RESOURCES, an Agency of the State of Florida, and the Trustees of the Internal Improvement Trust Fund, an Official Board of the State of Florida, Defendants.**

**No. 93–10039–CIV.**

United States District Court, S.D. Florida.

Nov. 8, 1993.

Michael Barnes, Key West, FL, for plaintiffs.

John W. Costigan, Asst. Gen. Counsel, Dept. of Environmental Protection, Tallahassee, FL, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court on Defendants' Motion to Dismiss with Prejudice, after full briefing and oral argument.

### I. Factual Background and Legal Posture

This action was filed by a group of plaintiffs seeking a declaratory judgment that certain Florida statutes are unconstitutional. Plaintiffs are attempting to avoid eviction from their floating homes on "Houseboat Row", bordering the island of Key West. Defendants point out that the occupants of these houseboats have signed leases with the City of Key West. The leases provide for automatic termination thirty days after the City offers the houseboat residents dockage space at the City's Garrison Bight Marina. Construction on Garrison Bight Marina has been completed, and Plaintiffs allege that Defendants have threatened to evict Plaintiffs from their floating residences. Plaintiffs question the validity of the leases, including the provision calling for termination upon an offer of space at Garrison Bight Marina.

However, Plaintiffs also correctly point out that the validity of the leases is not the issue before the Court in this case.

At issue in this case is whether the Defendants are prevented by *Federal* law from evicting Plaintiffs. Specifically, Plaintiffs have asked the Court to pass on the constitutionality of sections 253.67 through 253.71 of the Florida Statutes. These statutes establish a procedure for State leasing of submerged lands and the water columns above them.[1] Plaintiffs assert that these statutes treat the State of Florida's interest in the water column above submerged land as an ownership interest, and Plaintiffs argue that this renders the statutes unconstitutional because a State's control over the water column is narrowly circumscribed by Federal law.

### II. Historical and Legislative Background of Coastal and Submerged Lands

Under English law, all navigable waters and the land beneath them were held in trust by the sovereign for the benefit of the public. *See Merrill–Stevens Co. v. Durkee,* 62 Fla. 549, 57 So. 428, 431 (1911); *State v. Black River Phosphate Co.,* 32 Fla. 82, 13 So. 640, 643 (1893). This arrangement has become known as the Public Trust Doctrine. *Martin v. Lessee of Waddell,* 41 U.S. (16 Pet.) 367, 410–411, 10 L.Ed. 997 (1842). States such as Florida, which joined the Union after the original thirteen, acquired from the Federal Government rights in the lands within the State, including the lands between the high and low tide marks and the water that periodically covers it. *United States v. Kaiser Aetna,* 408 F.Supp. 42, 48 (D.Haw. 1976), *aff'd in part, rev'd in part on other grounds,* 584 F.2d 378 (9th Cir.1978), *rev'd on other grounds,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *see also Merrill–Stevens,* 57 So. at 431; *State ex rel. Ellis v. Gerbing,* 56 Fla. 603, 47 So. 353, 356 (1908). In Florida, these lands are held in the public trust by the Board of Trustees of the Internal Improvement Trust Fund. Fla.Stat.Ann.

---

1. Florida Statutes § 253.68 provides, in part:

   To the extent that it is not contrary to the public interest, and subject to limitations contained in ss. 253.67–253.75, the board of trustees [of the Internal Improvement Trust Fund] may lease submerged lands to which it has title for the conduct of aquaculture activities and grant exclusive use of the bottom and the water column to the extent required by such activities. Such leases may authorize use of the submerged land and water column for either commercial or experimental purposes.

§ 253.01 (West Supp.1993); *see also* Fla. Const. art. X, § 11 (incorporating the Public Trust Doctrine).

At issue in the instant controversy are lands *beyond* the low tide mark that remain submerged at all times. Florida and the other coastal States acquired rights in the submerged lands by the Submerged Lands Act, 43 U.S.C. § 1301, *et seq.* (1986 & West Supp.1993) ("SLA"). The SLA provides that:

> (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law . . . are hereby[ ] vested in and assigned to the respective States. . . .

43 U.S.C. § 1311(a). The SLA designates the seaward boundary of each State as three miles from its coastline. 43 U.S.C. § 1312. The SLA places important restrictions on the grant of these rights to the States. It provides that:

> The United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States. . . .

43 U.S.C. § 1314(a).

This case focuses on the scope of the rights the SLA grants in the waters above the submerged lands and whether the rights the Federal Government has reserved to itself render sections 253.67 through 253.71 of the Florida Statutes unconstitutional.

### III. *Standard of Review*

■ In this inquiry, Plaintiffs urge this Court to employ a strict scrutiny analysis. They point out that the SLA designates navigation as a "constitutional purpose". Plaintiffs argue: "The Act clearly recognizes that navigation is not a mere privilege, it is a Constitutional *right.* Therefore, it is a *fundamental* right which requires strict scrutiny of local legislation." Pls.' Mem. in Opp. at 8 (emphasis in original); *see also id.* at 15.

Assuming that the right to navigation is a constitutional right in the sense in which Plaintiffs use the term, this does not automatically make it a *fundamental* right meriting strict scrutiny. In fact, this Court is unaware of any case that has employed a strict-scrutiny analysis in addressing the right to navigation, hindrances to navigation, or navigation under the SLA. Strict scrutiny has not been employed by courts reviewing federal actions. *See, e.g., United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 66, 33 S.Ct. 667, 673, 57 L.Ed. 1063 (1913) ("[T]here is no room for a judicial review of the judgment of Congress that the flow of the river is not in excess of any possible need of navigation"; "Congress *did not act arbitrarily* in determining that 'for the purposes of navigation of said waters and the waters connected therewith,' the whole flow of the stream should be devoted exclusively to that end") (emphasis added); *Scranton v. Wheeler,* 179 U.S. 141, 162–63, 21 S.Ct. 48, 57, 45 L.Ed. 126 (1900) ("[W]hether navigation upon waters over which Congress may exert its authority requires improvement at all, or improvement in a particular way, are matters wholly within its discretion; and the judiciary is without power to control or defeat the will of Congress, so long as that branch of the Government does not transcend the limits established by the supreme law of the land"); *Gibson v. United States,* 166 U.S. 269, 272, 17 S.Ct. 578, 579, 41 L.Ed. 996 (1897) (holding that it is within Congress' power to determine what is and what is not an obstruction to navigation, and deferring to congressional findings that a particular project is in aid of navigation, be it diverting water from one channel to another, constructing a lighthouse, or closing certain

channels to the passage of navigators—even though "structures deemed by congress to be in aid of navigation might in fact be in obstruction of certain methods of navigation of the particular stream"). Nor has strict scrutiny been employed by courts passing on the permissibility of State actions. *See, e.g., Hawaiian Navigable Waters Preservation Soc. v. State of Hawaii,* 823 F.Supp. 766, 769–70 (D.Haw.1993) (outlining the traditional standard of review when considering a motion to dismiss a suit grounded on, *inter alia,* the Submerged Lands Act).

In the instant case, this Court is not required to apply strict scrutiny to the State's actions as they affect navigation.

## IV. Discussion

The Court must consider whether sections 253.67 through 253.71 of the Florida Statutes encroach upon the authority reserved to the Federal Government by the SLA and whether these statutes are otherwise preempted by Federal action.

■■ The Supreme Court has characterized the transfer of rights by the SLA, as a grant of "submerged lands and waters". *United States v. California,* 436 U.S. 32, 37, 98 S.Ct. 1662, 1664, 56 L.Ed.2d 94 (1978). In addition, the Congressional intent in passing the law is equally applicable to the waters as to the land; that intent was to further the Public Trust Doctrine by decentralizing management of the coastal areas, thereby fostering management more adapted to the prevailing needs of the area. *See Submerged Lands Act,* H.R.Rep. No. 215, 83d Cong., 1st Sess. (1953), *reprinted in* 1953 U.S.C.C.A.N. 1385, 1436–37 (indicating that States should control submerged lands because their interests are "so intimately connected with local activities"; and stating that, "[a]ny conflict of interest arising from the use of the submerged lands should be and can best be solved by local authorities").

By the terms of the SLA, the Federal Government expressly preserved navigational servitude, and it reserved the right to preempt any State law that impacted commerce, navigation, national defense, or inter-

national affairs. *See* 43 U.S.C. § 1314(a), set forth above.

## A. Navigational Servitude

■■ Navigational servitude is a concept that arises from the Commerce Clause of the Federal Constitution. *United States v. Twin City Power Co.,* 350 U.S. 222, 224, 76 S.Ct. 259, 260, 100 L.Ed. 240 (1956). It has been interpreted as a doctrine enabling the Federal Government to improve navigable waters and freeing the Government from the liability that would otherwise arise from its activities if taken on fast land. *Id.* at 233–34, 76 S.Ct. at 265 (Burton, J., dissenting) (citing *United States v. Kansas City Ins. Co.,* 339 U.S. 799, 808, 70 S.Ct. 885, 890, 94 L.Ed. 1277 (1950)); *accord Hawaiian Navigable Waters Preservation Soc.,* 823 F.Supp. at 772 (citing *Boone v. United States,* 944 F.2d 1489, 1494 (9th Cir.1991)). Under the doctrine of navigational servitude, the Federal Government may erect structures or otherwise modify a navigable stream without offering financial compensation to the State or to the owners of the submerged land. *Twin City Power,* 350 U.S. 222, 76 S.Ct. 259; *Gibson,* 166 U.S. 269, 17 S.Ct. 578. The doctrine also empowers the Federal Government to declare a State-erected structure or, presumably, a State-promulgated regulation or law, to be an illegal obstruction to a navigable waterway. *Gibson,* 166 U.S. at 272, 17 S.Ct. at 579 (citing *The Case of Clinton Bridge,* 77 U.S. (10 Wall.) 454, 19 L.Ed. 969 (1870)). However, the rights of the United States under the doctrine of navigational servitude do not divest the individual States of control over the water column *in the absence of* Federal action.

■■ Defendants argue that because under the SLA the Federal Government retains the right to use the water column for navigation, the State is prohibited from regulating anchorage, as such regulation would interfere with navigation. However, in the absence of affirmative action by the Federal Government, the SLA by itself is insufficient to prohibit State regulation of anchorage.

Recently, in *Hawaiian Navigable Waters Preservation Soc. v. State of Hawaii,* 823 F.Supp. 766 (D.Haw.1993), the United States

District Court in Hawaii considered a case strikingly similar to the one at hand. The plaintiffs in that case relied upon the SLA to challenge "the authority of the state to regulate mooring within navigable waters." *Id.* at 770. As in the instant case, the district court held that the State was not prohibited from enforcing such regulations. The court observed that "[t]he preemptive effect of the servitude can be no greater than that of the commerce clause from which it is derived. Federal action taken pursuant to the servitude preempts state action if the state action is explicitly or implicitly preempted or is in actual conflict with the federal law." *Id.* at 772. The court concluded that Congress did not intend the SLA, by itself, to serve as a basis for preemption. *Id.* at 772. The court concluded, "[T]here is no evidence of congressional intent to retain exclusive jurisdiction over the navigable waters of the states and significant evidence to the contrary." *Id.* This Court agrees with the district court's analysis in *Hawaiian Navigable Waters*.

## B. Federal Preemption

In addition to preserving the United States' rights under navigational servitude, the SLA reserved to the Federal Government the right to preempt any State law that impacted commerce, navigation, national defense, or international affairs. Plaintiffs do not contend that the State action at issue triggers the national defense or international affairs provisions. This Court is left to consider whether, under the commerce or navigation provisions, the State action is prohibited by Federal preemption.

Federal preemption exists when Government statutes or regulations include language explicitly preempting State action in a given area. In addition, implicit preemption can be found by a court when the Federal Government occupies a field through statutes or regulations which leave no room for supplementation by States, or when the subject area is particularly federally sensitive in nature, such as foreign affairs. Finally, a court may find that a State law is preempted when an actual conflict exists between State and Federal law. *Beveridge v. Lewis,* 939 F.2d 859, 862 (9th Cir.1991).

### 1. Explicit Preemption

In the instant case, the Federal Government has not explicitly preempted the State statutes at issue. Plaintiffs have not argued that the Government has done so, nor is this Court aware of any such explicit preemption. As has been pointed out above, the SLA, by itself, does not constitute an explicit preemption of State regulations.

### 2. Implicit Preemption

The Federal Government has not occupied the field of anchorage through pervasive regulation. The argument that it has was rejected by the Ninth Circuit in *Beveridge. Id.* In *Beveridge,* the appellants sued to block a city ordinance which prohibited the mooring or anchoring of vessels in a specified area during the winter months. The appellants argued that "the federal scheme of regulation of harbors and navigations ... is so vast that it should implicitly preempt local ordinances on this subject." *Id.* at 863. The circuit court rejected this argument. While the court noted that the United States Secretary of Transportation has extensive authority to regulate the anchoring and mooring of vessels, "[w]here he has not acted, no preemption has taken place." *Id.* at 864. The court held that the Federal regulations in the area of anchorage and mooring, though comprehensive, do not implicitly preempt supplemental State regulation in the same area. *Id.* Noting that the Supreme Court and the Ninth Circuit had previously upheld State regulation of tankers and pollution, the *Beveridge* court observed, "[T]here is no reason to believe that Congress intended to occupy the field in the area of mooring any more than in tankers or marine pollution. It might even be said that localities retain greater autonomy in this area." *Id. See also Bass River Associates v. Mayor of Bass River Township,* 743 F.2d 159 (3rd Cir.1984) (not specifically addressing the SLA, but holding that a local prohibition of "floating homes" was not preempted by

Federal vessel licensing or water pollution statutes).[2]

### 3. Actual Conflict

Finally, this Court must consider whether there exists an actual conflict between Federal and State laws such that the State law is preempted by the Federal. In this case, no actual conflict exists between Federal law and the State statutes.

### (a) Conflict Between State Statutes and the Submerged Lands Act

The State statutes at issue in this case do not conflict with the SLA by encroaching upon the rights reserved to the Federal Government by the SLA. Plaintiffs assert that, by these statutes, the State claims an ownership right in the water column above the submerged lands. These statutes, however, explicitly acknowledge that the State's ownership extends only to the submerged land and that its control over the water column is simply a necessary adjunct incident to its ownership (in the public trust) of the submerged land. Section 253.-68, for example, grants the Board of Trustees of the Internal Improvement Trust Fund the authority to "lease submerged lands to which it has title . . . and [to] grant exclusive use of the bottom and the water column to the extent required by such activities." Fla. Stat. § 253.68 (1991). The language of this and the other statutes clearly reflects that the grant of exclusive use of the water column is only incidental to the lease of the submerged lands. After all, in practical terms, a lease of submerged land to a private company to mine for minerals would, in many cases, be useless if a stationary structure could not be constructed on the surface to carry out the mining operation. In the absence of Federal action, the State does not encroach upon the authority reserved to the Federal Government when the State grants exclusive use of the water column as part of a lease of submerged lands.

In fact, State and Federal laws in this regard are in concert with each other. Florida's assertion of control over the water column incident to ownership of submerged sovereignty lands furthers a purpose sanctioned by Congress. The Coastal Zone Management Act, 16 U.S.C. § 1451 et seq. (1985 & West Supp.1993), encourages States to take an active role in the management of, and control over, the coastal zone, including submerged lands and coastal waters within the territorial boundaries of the State. Defendants argue that the Coastal Zone Management Act supports their position because (1) it indicates that State regulations prevailing at the time the Act was passed were inadequate to manage competing demands, as well as to protect and give high priority to natural systems in the coastal zone, 16 U.S.C. § 1451(h); and (2) one purpose of the Act was to "assist[ ] in the redevelopment of deteriorating urban waterfronts and ports, and sensitive preservation and restoration of historic, cultural and esthetic coastal features." [3] 16 U.S.C. § 1452(2)(F). Plaintiffs overlook the fact that the entire Act is intended to foster a cooperative effort between the Federal and State governments, with the Federal Government "encourag[ing] and assist[ing] the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of [federally approved] management programs. . . ." 16 U.S.C. § 1452(2). The Act further specifically declares it a national policy "to encourage the . . . cooperation of the public, state and local governments, and . . . the Federal agencies. . . ." 16 U.S.C. § 1452(4). The legislative history of the Coastal Zone Management Act indicates that Congress explicitly contemplated navigation as one of the areas the States should include in their management plans. *Commerce Committee,*

---

2. Plaintiffs discount *Bass River* as inapposite by pointing out that in the instant case, the issue is not whether federal licensing regulations and water pollution legislation preempt the right of a town to prohibit floating homes. However, this distinction is unavailing to Plaintiffs. Although *Bass River* did not address the SLA, the existence of federal legislation on areas so closely related to the permissibility of, and anchorage of, houseboats would make a *stronger* case for preemption there; and, conversely, the lack of similar legislation in the case at hand presents a weaker case for preemption.

3. Plaintiffs consider "Houseboat Row" to fall into this latter category.

*Coastal Zone Management Act,* S.Rep. No. 753, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4776, 4786. Florida did just that; in fact, the regulations being challenged by Plaintiffs were included in the State's plan and approved by the United States Secretary of Commerce. *Final Environmental Impact Statement of the Proposed Coastal Zone Management Program for the State of Florida,* Ex. 1 attached to Defs.' Mem. in Supp. of its Mot. to Dismiss.

### (b) Conflict Between State and Federal Laws on Anchorage & Mooring

On the issue of whether there exists conflicting Federal and State law, it is worth noting that the United States Coast Guard has issued a legal opinion indicating that no Federal law exists in the area of anchorage and mooring. The opinion finds that, in the absence of affirmative Federal action, the Coast Guard has no authority to limit State regulation of this area. The document does not expressly address the SLA, but it does refer to the Coastal Zone Management Act. It also finds the Coast Guard to be limited by an executive order on federalism. Exec. Order No. 12,612, 34 C.F.R. 252, 253 (1987). That order directs all Federal agencies to:

> construe ... a federal statute to preempt State law only when the statute contains an express preemption provision or there is some other firm and palpable evidence compelling the conclusion that the Congress intended preemption of sate law, or when the exercise of State authority directly conflicts with the exercise of federal authority under the federal statute.

*Id.* at 253.

Plaintiffs insist that the Coast Guard opinion reflects more a recognition of Coast Guard resource scarcity than constitutional analysis. Having reviewed the Coast Guard opinion, the Court disagrees. The Coast Guard document is a methodical analysis of constitutional and statutory law that concludes that, in the absence of Federal action, the Coast Guard, as a Federal entity, has no authority to limit State regulation of anchorage and mooring. Although that opinion is, of course, not binding on this Court, the Court finds its reasoning persuasive and con-

siders it an additional factor counseling the dismissal of this action.

### C. State Case Law, and Ownership of the Water Column

Finally, Plaintiffs point to a decision of the Florida District Court of Appeal, *Dennis v. City of Key West,* 381 So.2d 312 (Fla.Dist.Ct. App.1980), as support for their argument that the State cannot evict them from their moorings. At issue in *Dennis* was a portion of a city ordinance that prohibited the mooring of houseboats except in a designated area. The State court struck down that portion of the ordinance on the grounds that it represented an abuse of police power and appeared to have no foundation in reason or necessity.

The issue before this Court, however, is limited to whether the statutes upon which the State bases its actions are prohibited by Federal law. The Court finds that the State statutes are not preempted by Federal law or otherwise unconstitutional. Plaintiffs remain free to petition for a remedy in State court.

At oral argument and in their Supplemental Memorandum of Law, Plaintiffs argue emphatically that the issue in this case is whether the State *owns* the water column above the submerged lands, such that they can "evict" Plaintiffs. As has been seen above, however, the State statutes at issue do not purport to vest the State with ownership of the water column independent of its ownership of the submerged lands. Further, the State need not own the water column in order to regulate anchorage and mooring, as well as movement on the surface. The Federal Government, which possesses superior rights in the water column, has sanctioned the kind of regulations embodied in sections 253.67 through 253.71 of the Florida Statutes. These State statutes are not unconstitutional.

This holding does not leave Plaintiffs without a remedy. Although the statutes challenged by Plaintiffs are not unconstitutional, Plaintiffs are free to bring an action in State court alleging that the State's threatened eviction of them from their moorings goes

beyond the statutes or is otherwise unlawful. This Court holds simply that Florida Statutes 253.67 through 253.71 are not unconstitutional. These statutes do not offend the Federal Government's rights in the water column and are not preempted by Federal law.

### V. Conclusion

Accordingly, after a careful review of the record, and the Court being otherwise fully informed in the premises, it is

ORDERED, ADJUDGED, and DECREED that Defendants' Motion to Dismiss be, and the same is hereby, GRANTED. This declaratory judgment action is hereby DISMISSED.

DONE and ORDERED.